**IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT OF
HINDS COUNTY, MISSISSIPPI**

STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI,

          **Plaintiff,**

v.

CREDIT ACCEPTANCE CORPORATION

          **Defendant.**

**FILED**

APR 23 2019

EDDIE JEAN CARR, CHANCERY CLERK

Civil Action No.: G2019-515

## COMPLAINT

**COMES NOW**, the State of Mississippi, by the Honorable Jim Hood, Attorney General

for the State of Mississippi, and files this Complaint against Defendant Credit Acceptance

Corporation ("CAC") and, in support thereof, would show unto the Court as follows:

### I.    INTRODUCTION

1.    CAC, a self-proclaimed "leader in the subprime auto finance industry," represents

that it offers a second chance to credit-challenged car buyers. Yet, its slogan, "We change

lives!" and its representations that CAC can improve consumers' credit distort the fact that

CAC's risky, unaffordable subprime auto loans change many lives for the worse by pushing

consumers into financial ruin. For Mississippi loans originated between 2012 and 2015, CAC

has a repossession rate of ██████ and ████ its loans are either delinquent or in default.

Despite high default rates nationwide, CAC continues to increase its profits by millions of

dollars a year because at every turn CAC sets its system up to reap excessive profits from

subprime consumers.

2.    CAC's business model maximizes CAC's profitability and sets subprime

consumers up to fail. CAC's patent for its automated loan system, Credit Approval Processing

**EXHIBIT
1**

Systems (CAPS®), states that its system allows dealers to "quickly surmise which financing packages are financially attractive *to the dealer* so the dealer can "steer the customer toward purchasing a vehicle which may be financed on terms that will be most profitable *to the dealer* " - and thus most profitable to CAC.

3.     Under CAC's model, dealers buy their inventory low and price it very high to offset the risk of default. CAC dealers tier sale prices so that consumers with the poorest credit profiles receive the cheapest, lowest quality cars and pay the highest sale price markups. On top of that, CAC incentivizes dealers to tack on expensive ancillary products - described as "crap" by a CAC former employee - to further increase the loan amount and charges high interest rates, frequently at or near the maximum finance charge allowed under Mississippi law. By design, it is difficult for dealers to profit if they do not adhere to CAC's model.

4.     While it would otherwise make little sense to originate loans likely to fail, CAC limits its risk on the front end by artificially growing consumers' debt through sale price markups and ancillary products, charging high interest rates, and advancing dealers only a portion of the sale price upfront. Then, on the back end, CAC further limits its risk by engaging in aggressive collections, repossession, and litigation tactics to squeeze money out of delinquent consumers. For example, CAC pressures dealers to install kill switches with GPS in consumers' cars, giving CAC the ability to easily disable and repossess cars wherever and whenever with no notice. Even after repossession, CAC relentlessly pursues deficiency balances, often resulting in default judgments and wage garnishments. Collectively, these strategies enable CAC to turn a profit even if consumers ultimately default.

5.     Subprime loans are high-interest loans extended to consumers in the lowest credit tiers, mostly consumers with Fair Isaac Corporation (FICO) scores of less than 650. "Deep subprime" typically refers to loans for consumers with FICO scores below 550.

6.     While subprime auto loans are not new, the market for them has rapidly expanded.  Post-recession, this boom has come to bear many of the hallmarks of the ill-fated subprime mortgage boom that preceded it.  As with mortgage loans, lenders pool many subprime auto loans into asset-backed securities, and growing investor demand has fueled riskier lending. In 2018, auto lenders issued riskier auto asset-backed securities than in prior years.  Expectedly, delinquency rates have also hit historic highs.  At the end of 2018, more than seven million Americans were at least ninety days late on their auto loans - the highest number in the two decades the Federal Reserve Bank of New York has kept track.

7.     Predatory subprime auto lenders, like CAC, have disproportionately affected Mississippi, as one of the poorest states in the country.  Mississippi consumers pay among the highest interest rates and have the highest default rate in the country.

8.     For more than a year, the Mississippi Attorney General has conducted a detailed investigation of CAC.  The Attorney General's Office reviewed thousands of documents from numerous sources; analyzed data from over ███ CAC loans in Mississippi during a six year period; interviewed former CAC employees from different areas of CAC's business, including funding analysts and sales representatives; and interviewed third parties, including dealers who have worked with CAC, Mississippi consumers, and experts.

9.     This lawsuit seeks injunctive relief, including but not limited to disgorgement and civil penalties against CAC for knowingly and willfully engaging in unfair and deceptive trade

3

practices in subprime auto lending, servicing, repossession, and collection in Mississippi in violation of the Mississippi Consumer Protection Act, Miss. Code. Ann. § 75-24-1, *et seq.*

## II.     PARTIES

10.     Plaintiff the State of Mississippi ("State"), acting through its Attorney General Jim Hood, brings this action in the public interest pursuant to the Attorney General's statutory and *parens patriae* authority to enforce the Mississippi Consumer Protection Act. The claims asserted herein are brought solely by the State and are wholly independent of any claims that individuals consumers may have against CAC in this case.

11.     Defendant Credit Acceptance Corporation ("CAC") is a publicly traded corporation incorporated in Michigan with its principal place of business in Southfield, Michigan.

12.     At all relevant times, CAC has done business and continues to do business in the State of Mississippi. Its primary business in Mississippi consists of the extension of auto loans to Mississippi consumers for the purchase of vehicles through the indirect origination of retail installment contracts, and the associated servicing and collection of loans.

## III.     JURISDICTION

13.     Subject matter jurisdiction is proper under the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-9. This Complaint does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332. Likewise, federal question matter jurisdiction pursuant to 28 U.S.C. § 1331 is not invoked by this Complaint, as it sets forth herein exclusively viable state law claims against Defendant. Nowhere herein does the State plead, expressly or implicitly, any cause of action or request any remedy that arises under federal law. The issues presented in the allegations of this well-pleaded Complaint do not implicate substantial federal

issues and do not turn on the necessary interpretation of federal law.  Specifically, the Sate expressly avers that the only cause of action claimed, and the only remedies sought herein, are founded upon the positive statutory, common, and decisional laws of the State.  Further, assertion of federal jurisdiction over the clams made herein would improperly disturb the congressionally approved balance of federal and state responsibilities.  Accordingly any exercise of federal jurisdiction is without basis in fact or law.

      14.    CAC is subject to personal jurisdiction under Miss. Code Ann. § 13-3-57 because at all relevant times CAC did business in Mississippi.  Defendant's registered agent for the service of process in Mississippi is Corporation Service Company.

      15.    Venue is proper under Miss. Code Ann. § 11-11-3(1)(b) because CAC is a nonresident defendant and the Attorney General's primary office is located in Hinds County for purposes of venue.

## IV.    FACTUAL ALLEGATIONS

**A.    CAC Maximizes Profits While Setting Mississippi Consumers Up to Fail**

      16.    CAC represents that it "change[s] lives" by offering consumers opportunities to improve their credit, but the data CAC keeps on Mississippi consumers - which CAC claims is proprietary and trade secret - shows that in ▮▮▮▮▮▮, Mississippi consumers will do worse - not better - by doing business with CAC.  For Mississippi loans originated between 2012 and 2015, CAC has a repossession rate of ▮▮▮▮▮▮▮▮▮▮▮ of its loans are either delinquent or in default.  Rather than granting opportunities, CAC is actually just a lender of last resort that takes advantage of subprime consumers' desperate need for cars.



17.     CAC advertises that it will "approve every customer," even people who otherwise would not qualify for a loan due to multiple repossessions, temporary employment, or bankruptcies.



18.     Not surprisingly, CAC's consumers are almost exclusively people with impaired or limited credit histories.  Since 2015, over 95% of CAC's customers have had FICO scores below 650 or no FICO score at all.  Despite the risks in lending to people with such credit profiles, CAC's profits continue to increase.  In 2018, CAC had nearly $1.29 billion in revenue,

a 78% increase from 2014. CAC is so profitable because it designed every aspect of its business model to increase the company's bottom line and disadvantage consumers.

19.      CAC is an indirect auto lender, meaning CAC only lends money to consumers who obtain financing through dealers as part of the car buying process rather than lending to consumers who obtain financing independently. The Portfolio Program, which represents the bulk of CAC's business, is a unique program that distinguishes CAC from traditional lenders. In the Portfolio Program, CAC pays dealers an upfront advance, which varies based on the riskiness of the loan and the ancillary products added. Standard & Poor's estimated in a 2017 report that CAC's advances are normally 42-47% of the contract's full principal and interest.

20.      Typically, dealers have to earn their profit upfront and have no incentive to make affordable loans. CAC designed its system to generate large profits, benefiting both CAC and dealers, at the expense of consumers. According to its patent, CAC allows dealers "to quickly surmise which financing packages are financially attractive" to the dealer and "then steer the customer toward purchasing a vehicle which may be financed on terms that will be most profitable to the dealer." In addition, CAC trains dealers to charge inflated sale prices for cheap, high-mileage cars, sell expensive ancillary products of questionable value, and then charge extremely high interest rates.

1.      **CAPS Steers Consumers to the Most Profitable - Not Affordable - Loans**

21.      CAC's patent for CAPS makes clear that CAC geared its system towards helping dealers make the most money and steer customers to cars and loans that are best for the dealers - and thus CAC.

22.      CAPS uses consumers' credit information to calculate a potential financing package with proposed credit terms for each car in the dealer's inventory. For each potential

7

deal, CAPS also calculates dealers' front end profit and estimated back end profit, which most

dealers likely will never see.  According to CAC's patent, this function allows dealers "to

quickly surmise which financing packages are financially attractive" to the dealer and "the dealer

may then steer the customer toward purchasing a vehicle which may be financed on terms that

will be most profitable to the dealer . . . Such information will help determine which financing

packages the dealer decides to present to the customer."  The following is a diagram from CAC's

CAPS patent illustrating a screen for displaying financing packages (the headings associated

with columns 312, 318, 320, and 322 were added for explanation):



**FIG. 6**

23.    The tactic of steering consumers into specific cars, which, as explained below, are

low quality cars with high sale price markups, is the opposite of what happens in most traditional

car purchases where the consumer first selects a car and then discusses financing options for that specific car.

24.     Yet, CAC holds itself out to consumers to be like a traditional lender, promising consumers "the dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to structure a contract that meets your needs," and the consumer "select[s] a vehicle that works for [the consumers'] needs and budget." In reality, CAC's system is designed to direct customers only to those vehicles and financing packages that work for the dealerships and thus CAC.

### 2.     Under CAC's Model, Dealers Buy Cheap, High-Mileage Cars

25.     Under CAC's model, dealers benefit most from the purchase of cheap, high-mileage cars that often are in poor condition. CAC specifically tells dealers to buy vehicles with high mileages at lower wholesale values. According to CAC: "Because traditional lenders are less likely to accept these types of vehicles, other dealers are not buying them; therefore, you are likely to get a good price." CAC further encourages the practice by failing to impose a mileage limit. One former employee said it is not unusual for CAC to fund loans for cars with 140,000-170,000 miles.

26.     Not surprisingly, these cars are in poor condition. Many CAC consumers experience extensive mechanical issues shortly after purchasing their cars, suggesting the cars were not in proper working condition at the time of sale. One former CAC employee admitted CAC's cars are "pretty bad."

27.     One Mississippi consumer said the air conditioning and heating systems in her car went out the day she purchased it. After that, she claimed to experience a plethora of issues with the car, including the transmission failing and the car not being able to reach speeds in excess of

30 MPH.  The consumer estimated that she spent more than $3,000 before eventually surrendering the car at an auto repair shop.

28.     Another Mississippi consumer began experiencing mechanical issues with his car only months after purchasing it.  After the consumer complained to the federal Consumer Financial Protection Bureau, CAC agreed to refund the consumer a percentage of the repair costs he incurred.

### 3.     CAC's Dealers Then Grossly Mark Up Those Cheap, High-Mileage Cars

29.     CAC's model adds $3,500 to cars with a wholesale average value[1] of less than $2,500, $4,500 to cars with a wholesale average value between $2,500-$7,000, and $5,500 for cars with a wholesale average value higher than $7,000.

| How do I price my inventory? | CAPS provides a suggested selling price based on what you have to pay for the vehicle.  After you enter the total cost for the vehicle (ACV), CAPS will come up with a selling price.  You can always override this price and enter your own selling price.<br>An example calculation is below. | |
|---|---|---|
| | **Average Wholesale** | **Selling Price** |
| | <$2,500 | ACV + $3,500 |
| | $2,500 - $7,000 | ACV + $4,500 |
| | >$7,000 | ACV + $5,500 |
| Why should I use CAPS inventory pricing? | The suggested price calculated in CAPS provides enough "spread" (difference between cost and selling price) to allow a profitable deal across most customer ratings. | |

30.     CAC tells dealers to sell consumers with poorer credit the cheapest cars and to impose the highest relative sale price markup.  Specifically, CAC says dealers should buy cars at a cost between $2,000-$4,000 and sell them for $5,500-$8,500 – more than double the original cost to the dealer.  Even the least risky consumers are charged close to double the cost of the vehicle.

---

[1] The "wholesale average value" means the wholesale value for a car in average condition.

| What does it mean to have the right inventory mix? | You should always keep a good mix of different price levels for all customer ratings in your inventory but should tailor your inventory levels toward the rating you see the most. Having the right inventory mix will depend on the market you're in. Below is an example of an inventory mix that will provide you with several vehicles that work for any customer rating and a $1,500 down payment. |
|---|---|

| Customer Rating | Cost of Vehicle (ACV) | Selling Price |
|---|---|---|
| 1-3 | $6,000 - $7,000 | $10,500 - $12,500 |
| 4-6 | $4,000 - $6,000 | $8,500 - $10,500 |
| 7-10 | $2,000 - $4,000 | $5,500 - $8,500 |

31.     These gross sale price markups are the default under CAC's model. Dealers have to manually override CAC's high price in CAPS to charge a lower price, which CAC gives them no incentive to do.

32.     Dealers have confirmed that CAC's model grossly overprices cars. Multiple Mississippi dealers and a former CAC employee have said that no cash-paying consumer or consumer with prime credit would pay CAC's sale prices.

33.     One dealer, when asking for advice in an online forum, gave several examples of high sale prices set by CAC:

---

I think most of it has to do with the sticker shock. We were told by our rep not to put prices on the cars only advertise down payments or monthly payments. Sounded great because before we signed up the ONLY question anyone asked was "how much down." Well now all of a sudden everyone wants to know the total price. It's hard to look at someone with a straight face and tell them a price that's $2500 over high retail.

For example here are the suggested prices we were told these cars should go for:

2000 Mazda B4000 pickup $9,000-/+ (we had $4750)
2003 Honda Civic $8,300-/+ (we had $4500)
2005 Dodge Ram $12,500 (we had $7,600)
2006 Chevy Trailblazer $9,200-/+ (We had $5995)
2007 Impala $9,250-/+ (We had $6450)
2008 Impala $9,800-/+ (We had $6995)

Really? We were like 1/3 to 1/2 less on each one. Customers are not seeming to respond to well. Anyone have advise?

---

34.     Another CAC dealer said dealers have to mark up the sale price for cars between $4,000-$5,000, double what they generally would, due to CAC's fees. A third CAC dealer said CAC's sale price markup is typically $5,500 above the Black Book[2] wholesale average value.

35.     CAC's data on Mississippi's consumers confirm what dealers are saying and what its model requires. On average, CAC cars in Mississippi are marked up ███████ their Black Book wholesale average value.

36.     CAC does not disclose the fair market value of its cars, even when it provides a space for such disclosure on its own forms. Obviously, if consumers knew the fair market value, they would see CAC's gross sale price markup.

37.     The fact that CAC is only able to recover ███████ of the original sale price for cars when CAC sells them at auction following repossession further confirms CAC's gross overpricing. Even when CAC resells cars within six months of the original date of sale, it recovers an average of ███████ of the cars' original sale prices. For 10% of loans, CAC recovers ███████ of the cars' original sale prices, despite the fact that cars should be in a reasonably similar condition because CAC repossessed them so soon after the original sale. As a result, consumers often have substantial deficiency balances.

38.     CAC is well aware that price inflation is a predatory sales tactic that harms consumers. In a leasing program patented by CAC in 2001, CAC specifically prohibited dealers from increasing car prices above fair market value. CAC acknowledged that the measure negates dealers' incentive to grossly overprice a car, which it says is "particularly necessary where the target lessees are poor credit risks who are more susceptible to overly aggressive salespersons."

---

[2] The Black Book is a car value guide, similar to Kelly Blue Book.

12

**4.    CAC Makes Loans Even More Unaffordable and Further Lines Its Pockets by Adding Expensive Ancillary Products of Questionable Value**

39.    CAC increases the unaffordability of loans by incentivizing dealers to sell expensive, CAC-approved vehicle service contracts (VSCs) and guaranteed asset protection (GAP) waivers through its third party providers even though the products may provide little or no benefit to consumers.

40.    Under CAC's model, dealers have great incentives to sell expensive ancillary products to consumers.  As with its high prices, CAC's default setting within CAPS is to include both a VSC and GAP waiver on all loans.  The dealer must manually de-select the products, or CAPS adds them to the consumer's purchase.  This practice tells dealers that CAC wants them to add both ancillary products to every deal and creates an opportunity where consumers could be (and some have complained they are) charged for ancillary products they did not want.

41.    VSCs are very expensive products that provide little to no benefit for many consumers.  Although people sometimes refer to them as "extended warranties," VSCs are not warranties.  They are agreements to perform or pay for certain limited mechanical repairs or services.  They do not offer bumper-to-bumper coverage comparable to new car warranties.  The fine print says they only cover parts expressly identified in the contracts, and have numerous exclusions, including, but not limited to: pre-existing damage; maintenance service; and gradual reduction in performance due to day-to-day operation.  On top of these limitations, consumers cannot even initiate a claim unless they first prove they have performed all regularly scheduled maintenance suggested by the manufacturer.  CAC's VSCs sold in Mississippi are priced as high as ▮▮▮▮ with the average cost being ▮▮▮▮.

42.    Frequent consumer confusion about VSCs has caused many consumer agencies and advocates, including the Federal Trade Commission, the Better Business Bureau, and

13

Consumer Reports, to urge consumers to use caution when purchasing VSCs. A survey conducted by the St. Louis Better Business Bureau found that 93% of consumers who responded said their VSC provider refused to pay for repair claims they thought were covered by their contracts. Of those, 60% of consumers said their VSC provider said the contract did not cover the repair, 17% were told they lacked the proper maintenance documents, and 16% said the VSC provider classified the issue as a pre-existing condition.

43.     CAC told dealers that adding VSCs was a "win-win." According to CAC's sales pitch, VSCs maximize dealer profits and protect consumers by keeping their cars running, which in turn, increases the likelihood that consumers will make payments. While VSCs line dealers' and CAC's pockets, CAC's Mississippi consumer loan data does not show that they are a "win" for consumers. Mississippi consumers who purchase ancillary products are more likely to ███ ███████████████████████████████████.

44.     VSCs boost CAC's bottom line and increase dealers' upfront profits. Dealers earn a significant commission on VSCs and CAC retains an unknown portion of the remaining sale price.

45.     CAC has two VSC providers - SouthwestRe and Wynn's Extended Care. Neither provides a "win" for consumers. SouthwestRe has said it "is dedicated to providing highly profitable, comprehensive F&I solutions for our clients, who include *car dealers*, agents, *lenders*, real estate brokers and other industry professionals" and "provides clients with maximum profit for minimum risk." In contrast, its website does not provide specific product information that would enable consumers to research VSCs prior to purchasing them.

14

46.     Wynn's Extended Care has a website, but it is not easy to find, even if one searches "Wynn's Extended Care" online. This makes it difficult for consumers to contact the company or learn about its products.

47.     Both companies have VSCs with limited coverage. One Mississippi dealer said CAC's VSC providers have not updated their covered parts in a decade, resulting in the providers not covering newer parts, and characterized CAC's VSCs as a "BS warranty" for which CAC charges a premium. A former CAC employee also called CAC's VSCs "crap" due to their limited coverage.

48.     A GAP waiver is another expensive ancillary product of questionable value. CAC's GAP waivers in Mississippi are as high as ███. Like with VSCs, dealers make a significant commission on GAP and CAC keeps an unknown portion of the remaining sale price.

49.     CAC and dealers market GAP waivers as a product that covers the difference between consumers' loan balances and the amount covered by their primary auto insurance in the event of a total loss due to damage or theft. However, CAC has profit sharing arrangements with some providers that depend on the performance of the GAP contracts, meaning CAC profits when consumers do not make claims. Thus, CAC has a vested interest in ensuring consumers do not utilize GAP benefits.

50.     One former CAC employee told dealers that consumers in CAC loans need GAP due to high loan-to-value ratios. Ironically, CAC is responsible for driving up loan-to-value ratios by inflating sale prices and pushing expensive ancillary products, such as GAP.

51.     The vast majority of CAC loans have ████ ancillary product and many loans have ████ ancillary products. In Mississippi, ████ CAC loans have either a VSC or GAP and ████ have both. For a small number of loans, ancillary products account for ███

██████ of the total loan amount.  One Mississippi consumer's loan included ██████ for

ancillary products ████████████████████ even though the portion of the loan

attributable to the sale price of the car was ██████████.  The consumer's total repayment

amount, including an interest rate of ████████, was ██████████████████████

██████████████████.

52.     Neither the VSC nor GAP waiver discloses to consumers the terms under which

consumers will pay the contract.  As a result, CAC does not make consumers aware of how

much they will pay for ancillary products over the term of their loans.  One Mississippi

consumer purchased a VSC for ██████ and a GAP waiver for ██████.  The consumer then wrapped

both the ancillary products into the consumer's loan, with an interest rate of ██████ and a loan

term of ████████.  If the consumer pays the loan in full, the consumer will end up paying

██████ for the VSC and ██████ for the GAP waiver – ████████████████, which means the

ancillary products will end up costing the consumer about ██████ for a car with a wholesale

average value of ██████.

### 5.     On Top of Grossly Overpriced Cars and Ancillary Products, CAC Charges Consumers Extremely High Interest Rates

53.     CAC ensures that consumers pay high interest rates in addition to inflated sale

prices and ancillary products.  The average CAC interest rate in Mississippi is ██████.  To

compare, according to U.S. News & World Report, the average interest rate in December of

2018 on used car loans for consumers with a FICO score between 450 and 649 was 10.99% and

15.67% for consumers with a FICO score less than 450.

54.     ████████████████ CAC loans in Mississippi have an annual percentage rate that

is at or near Mississippi's finance charge cap, which ranges from 18% to 28.75% depending on

the age of the car.  ████████████ even exceed the state mandated financing cap.  Due to inflated

sale prices and overpriced add-ons, however, CAC consumers are paying much more than the stated interest to finance their cars. Consequently, ▮▮▮▮▮▮▮▮▮▮ CAC's loans in Mississippi would exceed - some greatly - the maximum finance charge if the finance charge included the sale price markup (*i.e.* the difference between the sale price paid by a cash or prime credit buyer (the fair market value) vs. the sale price paid by a subprime buyer) and the ancillary products.

55.  CAC financed a car for one Mississippi consumer with a sale price of ▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮ the Black Book wholesale average value and ▮▮▮▮▮▮ the Black Book highest available retail value, which is Black Book's value for cars in top condition. The loan included ▮▮▮▮ in CAC's ancillary products. The consumer paid a cash down payment of ▮▮▮▮ and financed the remaining balance of ▮▮▮▮ at an interest rate of ▮▮▮▮ for ▮▮▮▮▮. If the consumer had paid in full according to the terms of the loan, the consumer would have paid a total of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. CAC repossessed the consumer's car a little over ▮▮▮▮▮ into the repayment period. Nonetheless, CAC collected ▮▮▮▮▮ in addition to the consumer's down payment of ▮▮▮▮, meaning the total payment was ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ the car's inflated sale price.

56.  CAC financed a car for another Mississippi consumer with a sale price of ▮▮▮▮▮▮▮▮▮▮▮ the Black Book wholesale average value and ▮▮▮▮▮ the Black Book highest available retail value. CAC then allowed the dealer to add ▮▮▮▮ in CAC's ancillary products. The consumer traded in a car and paid a cash deposit worth a combined ▮▮▮▮ and financed the remaining ▮▮▮▮ at an interest rate of ▮▮▮▮ for ▮▮▮▮▮. If the consumer had paid in full according to the terms of the loan, the consumer would have paid a total of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. CAC repossessed the consumer's car

about ███████████████ and the consumer later ████████████. Still,

CAC collected ██████ in addition to the consumer's initial down payment and trade-in totaling

██████, meaning the total payment was ████████████████████████

████ the Black Book highest available retail value, but the consumer has nothing to show for it

except ruined credit.

**B.    CAC Engages in Aggressive Collection, Repossession, and Litigation Tactics to Squeeze Money out of Consumers**

57.    CAC knows that a significant number of consumers will never pay their loans in

full.  In 2018, CAC disclosed that it expects to collect less than 65% of the money that

consumers owe.  Despite this, CAC makes millions of dollars a year in profit.  It does this by

artificially growing the amount consumers owe on the front end through sale price markups,

expensive ancillary products, and high interest rates, as previously discussed, and then squeezing

as much money as it can out of consumers in collections, repossession, and litigation, utilizing

harassing and humiliating tactics.

58.    Although CAC's business is risky, the company is able to offset risks in several

ways.  When CAC funds loans, it only risks the advance it pays to dealers, not the full amount

financed by consumers.  If consumers default before CAC recoups advances, CAC offsets its

losses by engaging in aggressive debt collection, using kill switches, and repossessing and

selling consumers' cars and then pursuing deficiency judgments against consumers and

garnishing their wages, typically in default judgments.  If consumers default after CAC recoups

advances, the company can earn generous profits that exceed what CAC could earn lending to

consumers with better credit, which makes up for money lost in early delinquencies.  Standard &

Poor's estimates that CAC, on average, advances between 42-47% of the loan's full principal

18

and interest and recoups between 64-79% of the loan's value, leaving a large spread, particularly for loans ending in default.

59.     In addition, CAC bundles and securitizes loans to fund its lending and insulate itself from risks, allowing the company to fund riskier and riskier loans. Since 2011, CAC has become increasingly reliant on securitization for funding, which has allowed CAC to greatly increase loan volume.

60.     So far, these combined strategies have allowed CAC to generate massive profits. However, much of CAC's increased loan volume is due to CAC expanding into riskier markets as evidenced by its decreasing loan quality. In 2009, CAC's forecasted collection rate was almost 80%, but the company's current forecasted collection rate has fallen below 65%. If this trend continues, losses will likely outpace the gains CAC can earn by increasing volume, possibly leaving investors on the hook for CAC's risky loans.

**1.       CAC Engages in Humiliating and Aggressive Collection Tactics**

61.     One dealer said CAC is a "complete and total collection company." Although CAC markets itself as an auto lender, it acts more like a debt collector, including dedicating more resources to collecting on delinquent loans than originating new loans. Only 28% of CAC's staff is responsible for originating new loans. By contrast, nearly half of CAC's workforce is responsible for servicing, with the majority focusing on collecting delinquent loan balances.

62.     CAC uses its lending function to disguise its focus on debt collection. For example, CAC ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

63.     CAC also uses its army of collectors to squeeze every last penny out of consumers.  Mississippi consumers report that CAC calls them relentlessly when they are late with their payments.  If consumers do not answer, CAC calls third parties identified in consumers' applications, such as their references, landlords, and/or employers.  CAC has received numerous consumer complaints indicating it is engaging in a pattern of contacting the wrong people when collecting debts and refusing to stop calling consumers when requested. One Mississippi consumer, who co-signed on a CAC loan, said he received calls from 8 a.m. until 9 p.m. starting the day after payment was due.  CAC sometimes called the consumer 25 times a day.  When he asked CAC to stop calling, employees would say there is nothing they can do because the calls are computer generated.

64.     Another Mississippi consumer asked the Better Business Bureau what she could do to stop CAC's harassing phone calls since CAC blocks its number or calls from several different numbers.  Other consumers, including consumers who filed complaints online, said CAC's collection employees were rude and demeaning.

**2.     CAC Uses Kill Switches**

65.     CAC also humiliates consumers by pressuring dealers to use kill switches, which CAC euphemistically refers to as "starter interrupt devices," to easily repossess consumers' cars. CAC's kill switches, which include GPS, give CAC the ability to quickly and remotely disable and locate consumers' cars for repossession.

66.     CAC's own sales representatives market kill switches to dealers, which CAC's approved third party provider then sells with a kickback to CAC.  Although CAC represents that kill switches are not a condition of financing, CAC all but forces dealers to use them by paying dealers higher advances for using the devices and, in some instances, penalizing dealers for not

using the devices by deducting money from their advances.  It also waives proof of residence, one of CAC's few requirements, when dealers install a kill switch.

67.     CAC provides dealers with a consent form to use with consumers when they install kill switches.  The form presents the kill switch as a take it-or-leave-it option rather than a voluntarily add-on - another predatory tactic that disadvantages subprime consumers.  Also, the form does not disclose that CAC can activate kill switches at any time or place.

68.     In Mississippi, CAC activates kill switches on approximately ▮▮▮▮▮▮.  One Mississippi consumer had difficulty making her monthly car payment and asked CAC to voluntarily repossess her car.  CAC pushed the consumer to keep her car and pay as much as she could rather than surrendering it.  She paid CAC on and off for almost a year even though CAC disabled the car and it sat in the consumer's garage.  CAC eventually repossessed the consumer's car and sent her a deficiency letter stating she owed $3,000.  The consumer could not afford to pay the deficiency balance and filed for bankruptcy.

69.     CAC has the ability to shut off consumers' cars without warning when they are in default.  In addition to being embarrassing, CAC may leave consumers without necessary transportation and/or in dangerous situations.  One Mississippi consumer said CAC disabled his car while he was stopped at a traffic light and a busy intersection.

70.     CAC also uses kill switches to annoy, embarrass, and harass consumers prior to deactivating their cars by emitting a loud, high-pitched noise from the device every time consumers start their car.

### 3.     CAC Employs Aggressive Repossession Tactics

71.     CAC repossesses nearly ▮▮▮ of the cars it finances in Mississippi.  ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The majority of repossessions for loans

21

that CAC originated between 2012 and 2015 in Mississippi occurred when consumers' payments were less than ████ late.  Several consumers have complained to CAC and online that CAC wrongfully repossessed their cars when they were current on their payment or failed to acknowledge payment arrangements agreed to by CAC's employees.

72.     Although CAC's retail installment contract discloses to consumers that the company may repossess cars if consumers are in default, it does not disclose that CAC can repossess cars at any time or place.  It states, "To repossess the Vehicle, We can enter Your property, or the property where the Vehicle is stored . . . ."  This implies that CAC will repossess consumers' cars at their homes or from locations where the cars are typically kept, such as a garage.  But, CAC sometimes repossesses consumers' cars while they are parked in places other than consumers' homes, leaving consumers stranded.  CAC repossessed one consumer's car from a dialysis center where he was receiving treatment and another consumer's car from her place of employment.

73.     Many consumers have complained directly to CAC about the aggressive tactics of its repossession agents.  In one instance, a Mississippi consumer requested to remove her Army National Guard Reserve uniform from her car before CAC repossessed her car.  The repossession agent agreed but then unexpectedly took off as the consumer opened the door, dragging her down the road and injuring the consumer's head, shoulder, back, and leg.  In another instance, CAC's repossession agent repossessed a car with the consumers' dog tied to the front of it.  The consumers said the agent dragged their dog down the street and ultimately left the dog, who later died, in the middle of a highway.

4.    **CAC Aggressively Uses Mississippi Courts to Get Default Judgments and Garnishments**

74.    After CAC repossesses consumers' cars, they relentlessly pursue deficiency judgments and garnish consumers' wages. CAC's role as a prolific debt collector was well documented in a recent article that found one out of every eight civil lawsuits filed in Detroit's 36th District Court, the largest district court in the State of Michigan (CAC's home state), was a debt collection case brought by CAC against a consumer. The article also revealed that since 1995, CAC has garnished at least $27.5 million in wages and income-tax refunds from 6,556 Michigan consumers with 6,150 (94%) garnishments obtained through default judgments.

75.    In Mississippi, CAC has filed thousands of debt collection actions against consumers. In the past six years, CAC has filed over 2,800 in just three counties - Hinds, Harrison, and DeSoto. Also, Mississippi has the third highest rate of bankruptcies filed by debtors with CAC loans in the country.

76.    In 2017, all debt collection actions that CAC filed in Hinds County resulted either in a default judgment or dismissal due to lack of service. And, CAC obtained 100% of its wage garnishments through default judgments.

77.    One Mississippi consumer said CAC garnished her wages for a car she bought twenty years prior. The consumer financed a car with CAC in 1997 and later defaulted on the loan. CAC obtained a default judgment against her in 1998. The consumer's initial loan obligation was $6,471 ($5,271 for the car and $865 for a Wynn's VSC with 18% interest). When CAC obtained a default judgment against the consumer in 1998, CAC stated she owed $4,692 towards the principal. Once CAC added prejudgment interest and attorney's fees, the consumer's debt grew to $5,515. By 2013, the consumer's debt on the default judgment ballooned to $11,476, including $5,635 in additional interest.

78.     Another Mississippi consumer purchased a car that stopped working eight months later, at which point, the consumer had already spent a lot of money on repairs. She asked CAC to voluntarily repossess the car, but it refused. A law firm later sent the consumer a letter demanding $150 per month for the car. A few months after the consumer told CAC she could not afford to pay, CAC began garnishing $300-400 from her bi-weekly paychecks. Faced with the untenable option of paying between $600-800 per month for a car she drove for 8 months, the consumer declared bankruptcy.

79.     CAC's motto "We change lives!" belies the unavoidable fact that CAC's system is set up for consumers to fail. CAC trains dealers to sell overpriced, low quality cars with expensive ancillary products that CAC then finances at high interest rates over long loan terms so it can profit even when consumers default. These practices all but ensure large numbers of consumers will default. Yet, when consumers do default, as expected, CAC subjects them to aggressive collection, repossession, and litigation practices and pursues every last penny to maximize profits, pushing consumers further into financial crisis.

**C.     Mississippi Consumers Have Experienced Significant Harm due to CAC's Conduct**

80.     Many Mississippi consumers have been significantly harmed by CAC's predatory tactics. Although CAC represents that it will change consumers' lives and improve their credit, the data shows that, for many consumers, the opposite is true. CAC harms consumers by charging inflated sale prices for cars in poor condition, pushing expensive ancillary products of questionable value, and charging interest rates at or near the maximum allowed under Mississippi law. For ████████████████████, these additional costs consumers incur due to financing their cars result in the overall finance charge exceeding the limit set by Mississippi law.

24

81.     Consumers who are delinquent or default on their loans are subject to CAC's demeaning collection tactics, including non-stop collection calls and kill switches, and CAC's relentless pursuit of deficiency judgments that are, in some cases, decades old.  In almost all instances, CAC repossesses consumers' cars when they are in default, even though many of them have already paid more than the car is worth.  In the end, CAC loans further harm many consumers' credit, help drive consumers into bankruptcy, and make it that much more difficult for them to obtain financing in the future.

## V.     CLAIMS FOR RELIEF

### COUNT I

**Deceptive Trade Practices in Violation of the Mississippi Consumer Protection Act,
Miss. Code Ann. § 75-24-5(1) and § 75-24-5(2)**

82.     Plaintiff realleges and incorporates herein by reference the preceding allegations of this Complaint.

83.     Section 75-24-5 of the Mississippi Consumer Protection Act prohibits any person from engaging in "unfair or deceptive trade practices in or affecting commerce."

84.     CAC is a "person" within the meaning of, and subject to, the provisions of the Mississippi Consumer Protection Act.

85.     At all relevant times, CAC's services included, and continue to include, the extension of auto loans to Mississippi consumers for the purchase of vehicles through the indirect origination of retail installment contracts, and the associated servicing and collection of loans.

86.     Since at least as early as January 1, 2012, and with some instances occurring even earlier, and continuing to the present, CAC has knowingly and willfully engaged in deceptive trade practices in or affecting commerce, and misrepresented and concealed, among other things,

25

the characteristics, standard, and/or quality of its subprime auto lending services, and associated

servicing and collection of its loans in violation of the Mississippi Consumer Protection Act,

Miss. Code Ann. § 75-24-5(1) and § 75-24-5(2), by engaging in the acts and practices alleged

herein, including, but not limited to, repeatedly, and directly or indirectly:

    a.    Misrepresenting that CAC changes consumers' lives, when in fact, many Mississippi consumers' lives are negatively impacted as a result of their CAC loans;

    b.    Failing to disclose to Mississippi consumers that ████████, Mississippi consumers who do business with CAC end up delinquent or in default on their CAC loans;

    c.    Failing to disclose to Mississippi consumers that almost ██ of Mississippi consumers who do business with CAC have their cars repossessed;

    d.    Failing to disclose to Mississippi consumers their cars' actual value, even when required by CAC's own contracts;

    e.    Failing to disclose to Mississippi consumers that the cars are often in poor condition;

    f.    Failing to disclose to Mississippi consumers significant sale price markups on their cars;

    g.    Failing to disclose to Mississippi consumers with the poorest credit that they are steered to the cheapest, lowest quality cars with the highest relative sale price markups;

h.  Steering Mississippi consumers only to the cars and financing packages
    that are most profitable to dealers and CAC;

i.  Misrepresenting to Mississippi consumers that "the dealer will work with
    you to understand the type of vehicle you want, as well as work with your
    budget, to structure a contract that meets your needs" and the consumer
    "select[s] a vehicle that works for [the consumers'] needs and budget"
    when CAPS is set up so that the dealer presents to the consumer only
    those cars and financing packages that work for the dealers' and CAC's
    needs and profits;

j.  Extending loans to Mississippi consumers with significantly inflated sale
    prices intended to offset the risk of lending to subprime consumers while
    also charging Mississippi consumers interest rates frequently at or near the
    maximum allowed under Mississippi law;

k.  Financing loans regardless of Mississippi consumer's ability to repay,
    based on CAC's ability to repossess the collateral underlying the loan and
    its ability to profit from high sale prices and high interest rates despite
    defaults;

l.  Failing to disclose to Mississippi consumers that it makes loans regardless
    of the consumers' ability to repay, based on its ability to repossess the
    collateral underlying the loan and its ability to profit from high sale prices
    and high interest rates despite default;

m.   Failing to disclose to Mississippi consumers the known and significant

risk that they will default based on the layers of risk CAC has introduced

into its underwriting;

n.   Encouraging dealers to sell expensive ancillary products that it knows, or

reasonably should know, may provide little or no benefit to Mississippi

consumers;

o.   Failing to disclose to Mississippi consumers material information in

contracts for ancillary products, including, but not limited to, information

that is required by Mississippi law;

p.   Failing to clearly and conspicuously disclose to Mississippi consumers

that: (1) VSCs are not warranties and do not offer bumper-to bumper

coverage comparable to new car warranties; (2) VSCs cover specifically

defined parts and repairs; (3) VSCs have many restrictions and limitations,

including that VSCs do not cover pre-existing issues, routine maintenance,

or problems caused by normal wear and tear; and (4) VSCs require

consumers to perform, and keep records to document, all maintenance and

services recommended by the manufacturer;

q.   Misrepresenting to Mississippi consumers that kill switches are not a

condition of financing, when in fact, many consumers cannot obtain

financing unless they agree to have a kill switch installed in their car;

r.   Failing to disclose to Mississippi consumers that kill switches can be

activated at any time or place; and

28

s.   Misrepresenting to Mississippi consumers that CAC will only repossess

cars from consumers' homes or where consumers' cars are stored.

87.   These deceptive practices have the capacity or tendency to deceive Mississippi

consumers.

**COUNT II**

**Unfair Trade Practices in Violation of the Mississippi Consumer Protection Act,
Miss. Code Ann. § 75-24-5(1) and § 75-24-5(2)**

88.   Plaintiff realleges and incorporates herein by reference the preceding allegations

of this Complaint.

89.   Section 75-24-5 of the Mississippi Consumer Protection Act prohibits any person

from engaging in "unfair or deceptive trade practices in or affecting commerce."

90.   CAC is a "person" within the meaning of, and subject to, the provisions of the

Mississippi Consumer Protection Act.

91.   At all relevant times, CAC's services included, and continue to include, the

extension of auto loans to Mississippi consumers for the purchase of vehicles through the

indirect origination of retail installment contracts, and the associated servicing and collection of

loans.

92.   Since at least as early as January 1, 2012, and with some instances occurring even

earlier, and continuing to the present, CAC has knowingly and willfully engaged in unfair trade

practices in or affecting commerce by engaging in the acts and practices alleged herein,

including, but not limited to, repeatedly, and directly or indirectly:

a.   Misrepresenting that CAC changes consumers' lives, when in fact, many

Mississippi consumers' lives are negatively impacted as a result of their

CAC loans;

29

b.    Failing to disclose to Mississippi consumers that ███████████,

Mississippi consumers who do business with CAC end up delinquent or in

default on their CAC loans;

c.    Failing to disclose to Mississippi consumers that almost ███ of

Mississippi consumers who do business with CAC have their cars

repossessed;

d.    Failing to disclose to Mississippi consumers' their cars' actual value, even

when required by CAC's own contracts;

e.    Failing to disclose to Mississippi consumers significant sale price markups

on their cars;

f.    Extending loans to Mississippi consumers with significantly inflated sale

prices intended to offset the risk of lending to subprime consumers while

also charging Mississippi consumers interest rates frequently at or near the

maximum allowed under Mississippi law;

g.    Failing to disclose to Mississippi consumers that the cars are often in poor

condition;

h.    Steering Mississippi consumers with the poorest credit to the cheapest,

lowest quality cars with the highest relative sale price markups;

i.    Failing to disclose to Mississippi consumers with the poorest credit that

they are steered to the cheapest, lowest quality cars with the highest

relative sale price markups;

j.    Obscuring from Mississippi consumers their cars' actual values;

k.    Misrepresenting to Mississippi consumers that "the dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to structure a contract that meets your needs" and the consumer "select[s] a vehicle that works for [the consumers'] needs and budget" when CAPS is set up so that the dealer presents to the consumer only those cars and financing packages that work for the dealers' and CAC's needs and profits;

l.    Extending loans to Mississippi consumers on terms they believe they can afford but which CAC knows, or reasonably should know, a significant percentage will not be able to repay, as a result of low credit scores, low income, high loan-to-value ratios, and other underwriting risks;

m.    Obscuring from Mississippi consumers the risks and lack of affordability of their loans by layering multiple underwriting risks on top of one another in the same loan;

n.    Underwriting loans with regard to CAC's ability to profit from the loans even in the event of default, rather than Mississippi consumers' ability to repay the loans in full;

o.    Failing to disclose to Mississippi consumers that it makes loans regardless of the consumers' ability to repay, based on its ability to repossess the collateral underlying the loan and its ability to profit from high sale prices and high interest rates despite default;

p.     Extending loans on terms that enable and encourage dealers to sell and Mississippi consumers to buy, expensive ancillary products that may provide little or no benefit to consumers;

q.     Allowing dealers to omit material information in contracts for ancillary products sold to Mississippi consumers, including, but not limited to, information that is required by Mississippi law;

r.     Failing to clearly and conspicuously disclose to Mississippi consumers that: (1) VSCs are not warranties and do not offer bumper-to bumper coverage comparable to new car warranties; (2) VSCs cover specifically defined parts and repairs; (3) VSCs have many restrictions and limitations, including that VSCs do not cover pre-existing issues, routine maintenance, or problems caused by normal wear and tear; and (4) VSCs require consumers to perform, and keep records to document, all maintenance and services recommended by the manufacturer;

s.     Engaging in aggressive and harassing debt collection, including making multiple calls per day to Mississippi consumers who are behind on payments, and calling third parties when the consumers cannot be reached;

t.     Utilizing kill switches to harass Mississippi consumers;

u.     Misrepresenting that kill switches are not a condition a financing, when in fact, many Mississippi consumers cannot obtain financing unless they agree to have a kill switch installed in their car;

v.     Failing to disclose to Mississippi consumers that kill switches can be activated at any time or place;

   w. Repossessing cars and/or activating kill switches when Mississippi

     consumers are away from home, leaving them stranded; and

   x. Engaging in a pattern of using repossession agents who engage in illegal

     practices.

93. These practices are unfair in that they have caused and are likely to cause

substantial injury to Mississippi consumers; that injury is not outweighed by any countervailing

benefit to consumers or competition; and the injury cannot be reasonably avoided.

94. These practices also violate public policy and are unethical and unscrupulous.

## VI. REQUEST FOR RELIEF

**WHEREFORE**, the State respectfully requests that the Court:

95. Determine that CAC has engaged in unfair and deceptive trade practices in

violations of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5(1) and

§ 75-24-5(2);

96. Permanently enjoin CAC from engaging in lending and collections practices that

violate the Mississippi Consumer Protection Act including, but not limited to, the unfair and

deceptive trade practices recited herein.

97. Order disgorgement as a form of injunctive relief for CAC's violations of the

Mississippi Consumer Protection Act;

98. Order CAC to pay a civil penalty up to the maximum $10,000 for each and every

violation of the Mississippi Consumer Protection Act, Miss. Code Ann.

§ 75-24-19(1)(b) for its knowing and willful conduct;

99. Order CAC to pay the State's attorney's fees and costs under the Mississippi

Consumer Protection Act, Miss. Code Ann. § 75-24-19; and

100.   Order such other relief as the Court deems just.

DATED this 23ʳᵈ day of April 2019.

PLAINTIFF, STATE OF MISSISSIPPI ex rel.
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI


By: _____
Jacqueline H. Ray MSB#100169)
George W. Neville (MSB#3822)
Mary Jo Woods (MSB#10468)
Donald L. Kilgore (MSB#3758)
Special Assistant Attorneys General
Office of the Mississippi Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: 601.359.3680
Facsimile: 601.359.2003
Email: jacra@ago.state.ms.us,
         gnevi@ago.state.ms.us
         mwood@ago.state.ms.us
         dkilg@ago.state.ms.us

OF COUNSEL:

Blake A. Tyler (MSB#101786)
Jason M. Kirschberg (MSB# 104860)
GADOW TYLER PLLC
511 East Pearl Street
Jackson, Mississippi 39201
Telephone: 601.355.0654
Facsimile: 601.510.9667
Email: blake@gadowtyler.com,
         jason@gadowtyler.com

*Attorneys for Plaintiff*

34