# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

STATE OF MISSISSIPPI *ex rel.*
JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI                                    **PLAINTIFF**

**CIVIL ACTION NO. 3:19-cv-353-HTW-LRA**

VS.

**ORAL ARGUMENT REQUESTED
PURSUANT TO L.U. Civ. R. 7(b)(6)**

CREDIT ACCEPTANCE
CORPORATION                                                 **DEFENDANT**

---

## CREDIT ACCEPTANCE CORPORATION'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

---

**BRUNINI, GRANTHAM,
  GROWER & HEWES, PLLC**

R. David Kaufman (MS Bar No. 3526)
M. Patrick McDowell (MS Bar No. 9746)
Cody C. Bailey (MS Bar No. 103718)
The Pinnacle Building, Suite 100
190 East Capitol Street (39201)
Post Office Drawer 119
Jackson, MS 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902

**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**

Jonathan Frank (*pro hac vice*)
Patrick G. Rideout (*pro hac vice*)
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Anand S. Raman (*pro hac vice*)
Darren M. Welch (*pro hac vice*)
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

*Counsel for Defendant
Credit Acceptance Corporation*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL ALLEGATIONS ................................................................................................4

LEGAL STANDARD...........................................................................................................7

ARGUMENT ........................................................................................................................8

I.     THE ATTORNEY GENERAL CANNOT USE LITIGATION TO
LEGISLATE A COMPREHENSIVELY REGULATED INDUSTRY ............................8

     A.     Indirect Auto Finance in Mississippi Is
Governed By a Comprehensive Regulatory Scheme................................................8

     B.     The Attorney General Impermissibly Asks This
Court to Use the MCPA to Legislate By Judicial Fiat............................................9

II.     THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE MCPA CLAIM...................13

     A.     The MCPA Does Not Apply to Lending or Debt Collection.................................13

     B.     Consensual, Informed Credit
Transactions Are Not "Unfair" or "Deceptive" .....................................................15

          1.     Credit Acceptance Cannot Be Held Liable for Dealer Conduct ...............16

          2.     The Attorney General Cannot
Second-Guess Informed Consumer Choices ............................................18

          3.     Credit Acceptance Has Not Made Any
False or Misleading Representations to Consumers ..................................20

III.     THE ATTORNEY GENERAL IS NOT ENTITLED TO THE RELIEF SOUGHT.........22

     A.     The Attorney General Seeks an Impermissible
Injunction Ordering Credit Acceptance to "Obey the Law"...................................22

     B.     The Attorney General Is Not Entitled to Restitution, Civil
Penalties, Investigative Costs or Reasonable Attorneys' Fees ..............................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Alpert Nationstar Mortgage LLC*,
  Case No. C15-1164 RAJ, 2019 WL 1200541 (W.D. Wash. Mar. 14, 2019) ...................19

*American Financial Services Ass'n v. FTC*,
  767 F.2d 957 (D.C. Cir. 1985) ........................................................................................19

*Anderson v. General Motors Acceptance Corp.*,
  476 F. Supp. 2d 624 (N.D. Miss. 2007), *aff'd*,
  269 F. App'x 452 (5th Cir. 2008) .................................................................11, 12, 18, 25

*Anderson v. HSBC Bank Nevada, N.A.*,
  No. CV 09-04271 DDP (Ex), 2009 WL 10671379 (C.D. Cal. Sept. 23, 2009),
  *aff'd*, 269 F. App'x 452 (5th Cir. 2008) ..........................................................................15

*Archer v. Nissan Motor Acceptance Corp.*,
  633 F. Supp. 2d 259 (S.D. Miss. 2007), *aff'd*, 550 F.3d 506 (5th Cir. 2006) ...................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................................11

*Barrett v. Jones, Funderburg, Sessums, Peterson & Lee, LLC*,
  27 So. 3d 363 (Miss. 2009) ............................................................................................17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .....................................................................................................7, 25

*Berkley v. Midfirst Bank*,
  No. 3:15-CV-110-SA-SAA,
  2016 WL 2907705 (N.D. Miss. May 18, 2016) ...............................................................14

*Bescos v. Bank of America*,
  129 Cal. Rptr. 2d 423 (Cal. Ct. App. 2003) ....................................................................17

*Bryan v. Aron*,
  941 So. 2d 831 (Miss. Ct. App. 2006) .............................................................................14

*Burley v. Homeowners Warranty Corp.*,
  773 F. Supp. 844 (S.D. Miss. 1990), *aff'd*, 936 F.2d 569 (5th Cir. 1991) ........................14

*Byrd v. Paw Paw's Camper City, Inc.*,
  967 So. 2d 1251 (Miss. Ct. App. 2007) ...........................................................................11

*California v. Infineon Technologies AG*,
  No. C 06-4333 PJH, 2008 WL 1766775 (N.D. Cal. Apr. 14, 2008) .................................24

*Campbell v. DLJ Mortgage Capital, Inc.*,
    628 F. App'x 232 (5th Cir. 2015) ...................................................................14

*Castleberry v. Goldome Credit Corp.*,
    408 F.3d 773 (11th Cir. 2005) ......................................................................17

*Chrysler Credit Corp. v. Barnes*,
    191 S.E.2d 121 (Ga. Ct. Ap. 1972) ..............................................................17

*City of Cars, Inc. v. Simms*,
    526 So. 2d 119 (Fla. Dist. Ct. App. 1988) .....................................................15

*In re Cliffdale Associates, Inc.*,
    103 F.T.C. 110 (1984)...................................................................................16

*Coleman v. General Motors Acceptance Corp.*,
    220 F.R.D. 64 (M.D. Tenn. 2004) ...............................................................17

*Corenswet, Inc. v. Amana Refrigeration, Inc.*,
    594 F.2d 129 (5th Cir. 1979) .......................................................................23

*Davis v. General Motors Acceptance Corp.*,
    406 F. Supp. 2d 698 (N.D. Miss. 2005).........................................................11

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) .................................................16, 18, 19, 21

*Diageo North America, Inc. v. Mexcor, Inc.*,
    661 F. App'x 806 (5th Cir. 2016) ..................................................................23

*Doe v. Venemen*,
    380 F.3d 807 (5th Cir. 2004) .......................................................................23

*Fairley v. Turan-Foley Imports, Inc.*,
    65 F.3d 475 (5th Cir. 1995) ...........................................................................9

*Hancock County Board of Supervisors v. Ruhr*,
    No. 1:10CV564 LG-RHW, 2013 WL 4483376 (S.D. Miss. Aug. 20, 2013) .............23, 24

*Humphrey v. Citibank NA*,
    No. 2:12CV148M-V, 2013 WL 5407195 (N.D. Miss. Sept. 25, 2013)............................14

*Kerr-McGee Chemical Corp. v. Buelow*,
    670 So. 2d 12 (Miss. 1995).............................................................................13

*Mancha v. Immigration & Customs Enforcement*,
    No. 1:06-CV-2650-TWT, 2007 WL 4287766 (N.D. Ga. Dec. 5, 2007)............................24

iv

*In re MCI Worldcom, Inc. Securities Litigation*,
191 F. Supp. 2d 778 (S.D. Miss. 2002)............................................................22

*In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation*,
190 So. 3d 829 (Miss. 2015)...............................................................16

*NLRB v. Express Publishing Co.*,
312 U.S. 426 (1941).........................................................................23

*Original Great American Chocolate Chip Cookie Co.*
*v. River Valley Cookies Ltd.*,
970 F.2d 273 (7th Cir. 1992) ..........................................................24

*Payne v. Travenol Laboratories, Inc.*,
565 F.2d 895 (5th Cir. 1978) ..........................................................23

*Pizza Hut, Inc. v. Papa John's International, Inc.*,
227 F.3d 489 (5th Cir. 2000) ..........................................................21

*Pursell v. First American National Bank*,
937 S.W.2d 838 (Tenn. 1996)..........................................................15

*Rabago v. Deutsche Bank National Trust Co.*,
No. 5:10-CV-01917-JST (DTBx), 2011 WL 2173811
(C.D. Cal. June 1, 2011) ..................................................................19

*Rawls v. Friedman's Inc.*,
No. Civ. A. 4:02CV510LN, 2003 WL 21728838
(S.D. Miss. June 27, 2003)..............................................................11

*Rodriguez v. VIA Metropolitan Transit System*,
802 F.2d 126 (5th Cir. 1986) ..........................................................24

*Rojas v. Wells Fargo Bank, N.A.*,
571 F. App'x 274 (5th Cir. 2014) .....................................................15

*Rooster's Grill, Inc. v. Peoples Bank*,
965 F. Supp. 2d 770 (S.D. Miss. 2013).............................................18

*Ross v. Quality Homes of McComb, Inc.*,
No. 5:17-cv-46-DCB-MTP, 2017 WL 5505111
(S.D. Miss. Nov. 16, 2017) ..............................................................14

*Ruffino v. City of Hoover*,
No. CV 08-B-0002-S, 2009 WL 10687946 (N.D. Ala. Mar. 4, 2009) ..............................24

*Rutland Marble Co. v. Ripley*,
77 U.S. 339 (1870)..........................................................................24

*Scott v. Schedler,*
    826 F.3d 207 (5th Cir. 2005) .................................................................23

*Stubbs v. Mississippi Farm Bureau Casualty Insurance Co.,*
    825 So. 2d 8 (Miss. 2002)........................................................................8

*Taylor v. Southern Farm Bureau Casualty Co.,*
    954 So. 2d 1045 (Miss. Ct. App. 2007) ...............................................14

*Thatcher v. Brennan,*
    657 F. Supp. 6 (S.D. Miss. 1986), *aff'd*, 816 F.2d 675 (5th Cir. 1987)............................17

*Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill,*
    561 F.3d 377 (5th Cir. 2009) ...................................................................7

*United Credit Corp. v. Hubbard,*
    905 So. 2d 1176 (Miss. 2004) ............................................................3, 20

*Villarreal v. Wells Fargo Bank, N.A.,*
    814 F.3d 763 (5th Cir. 2016) ...................................................................4

*Wesley v. Schaller Subaru, Inc.,*
    893 A.2d 389 (Conn. 2006) ...................................................................17

*Young v. Bristol-Myers Squibb Co.,*
    No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320
    (N.D. Miss. Feb. 22, 2017) ...............................................................7, 20

*Young v. Harbor Mortor Works, Inc.,*
    Civil Action No. 2:07-CV-31 JVB, 2009 WL 187793
    (N.D. Ind. Jan. 27, 2009) ......................................................................17

## STATUTES

15 U.S.C. § 1601 ........................................................................................9

15 U.S.C. § 1692 .....................................................................................9, 12

15 U.S.C. § 1692b ....................................................................................12

15 U.S.C. § 1692c ..................................................................................9, 12

15 U.S.C. § 1692d .................................................................................9, 12

15 U.S.C. § 1692e .................................................................................9, 12

15 U.S.C. § 1692f .................................................................................9, 12

15 U.S.C. § 1692g ....................................................................................12

15 U.S.C. § 1692h ........................................................................................ 12

15 U.S.C. § 1692i ......................................................................................... 12

15 U.S.C. § 1692j ......................................................................................... 12

Miss. Code Ann. § 63-19-3 ............................................................................ 8

Miss. Code Ann. § 63-19-19 .......................................................................... 17

Miss. Code Ann. § 63-19-31 ....................................................................... 9, 10

Miss. Code Ann. § 63-19-35 ........................................................................... 9

Miss. Code Ann. § 63-19-43 ........................................................................... 9

Miss. Code Ann. § 63-19-57 .......................................................................... 12

Miss. Code Ann. § 75-24-3 ................................................................. 13, 15, 16

Miss. Code Ann. § 75-24-5 ............................................................................ 13

Miss. Code Ann. § 75-24-9 ...................................................................... 22, 25

Miss. Code Ann. § 75-24-11 .......................................................................... 24

Miss. Code Ann. § 75-24-19 .......................................................................... 24

Miss. Code Ann. §§ 83-65-101 to -125 ........................................................ 10

## RULES

Fed. R. Civ. P. 65(d) ..................................................................................... 23

## REGULATIONS

12 C.F.R. Pt. 226, Supp. I, Subpt. D ............................................................ 10

12 C.F.R. § 226.28(a) .................................................................................... 10

## OTHER AUTHORITIES

1974 Miss. Laws Ch. 555. (H.B. 41) ............................................................ 13

Black's Law Dictionary (10th ed. 2014) ....................................................... 14

1 Jeffrey Jackson et al., *Encyclopedia of Mississippi Law* § 4:19 (2d ed. 2018) .......................... 17

Opinion No. 2000-0194, 2000 WL 638798 (Miss. Att'y Gen. Apr. 4, 2000) ................................. 14

Credit Acceptance Corporation ("Credit Acceptance," "CAC" or the "Company") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Complaint filed by Plaintiff State of Mississippi *ex rel.* Jim Hood, Attorney General of the State of Mississippi (the "Attorney General"), with prejudice.

## PRELIMINARY STATEMENT

In this action, the Attorney General seeks to use litigation against a single company, Credit Acceptance, as a vehicle to legislate new regulations governing the entire subprime auto lending industry. Credit Acceptance is an indirect auto finance company operating in Mississippi that accepts assignment of retail installment contracts ("Contracts") entered into between Mississippi auto dealers ("Dealers") and their customers for the purchase of vehicles. As such, Credit Acceptance is subject to comprehensive state and federal regulatory regimes that govern *every facet of the auto finance industry*, including, among others, the Mississippi Motor Vehicle Sales Finance Law ("MVSFL"), Miss. Code Ann. §§ 63-19-1 *et seq.*, and the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* (*See infra* § 1(A).)

Remarkably, the Complaint fails to mention any of the myriad state and federal statutes and regulations to which indirect auto finance companies like Credit Acceptance are subject. Indeed, the Complaint does not allege that Credit Acceptance's purported conduct violated even a single provision of such governing statutes and regulations. Rather, in apparent disagreement with the Mississippi Legislature and United States Congress over the appropriate balance between consumer protection and consumers' necessary access to credit, the Attorney General seeks to implement his own "public policy" agenda by asserting that Credit Acceptance's lawful business practices purportedly violated the general prohibition on "unfair" and "deceptive" practices in the Mississippi Consumer Protection Act ("MCPA"). Specifically, the Complaint asserts that it is "unfair" and "deceptive" to lend to consumers with impaired or limited credit

histories or use lawful means to collect amounts concededly owed on Contracts. As set forth more fully below, the Attorney General's attempt to use the MCPA to circumvent the legislative process should be rejected, and the Complaint should be dismissed for numerous separate and independent reasons:

First, the Attorney General must not be permitted to impose additional "regulatory" requirements on indirect auto lenders through litigation. In attempting to legislate by lawsuit, the Attorney General seeks, among other things, to: implement interest rate caps that are lower than those statutorily imposed by Mississippi law and a finance charge calculation methodology that is preempted by TILA; require auto lending disclosures that are significantly more detailed than the law mandates; and require creditors to act as guarantors for the success of the Contracts they service and desist from using lawful measures to collect on defaulted Contracts. Courts have routinely rejected similar attempts to usurp the role of the legislature and impose obligations on defendants beyond those mandated by state and federal law. Moreover, the Mississippi Legislature has expressly exempted licensed finance companies, like Credit Acceptance, from liability under general sources of law—including the MCPA—where, as here, they comply with governing rules and regulations. (*See infra* § I(B).)

Second, unlike the comprehensive regulatory scheme to which auto finance companies like Credit Acceptance are subject, the MCPA applies only to "trade" or "commerce" in "goods" and "services." Neither the extension of credit nor the collection of debt fits within the plain meaning of those terms. Thus, the MCPA is not applicable to Credit Acceptance's alleged conduct. (*See infra* § II(A).)

Third, even assuming *arguendo* that the MCPA were applicable (and it is not), the Complaint fails to allege a plausible MCPA violation. As a threshold matter, there is no merit to

the Complaint's attempt to hold Credit Acceptance vicariously liable for Dealer misconduct. The Complaint acknowledges that Credit Acceptance is an *indirect* auto finance company, which means that Credit Acceptance does not have direct contact with consumers regarding the terms of their vehicle purchase. Nonetheless, the Complaint attempts to fault Credit Acceptance for a laundry list of alleged Dealer misconduct, including, among other things, the purported sale of low-quality cars at high prices. Courts universally have held that dealers are not agents of auto lenders, and, thus, lenders cannot be held liable for dealer misconduct. Accordingly, these claims should be dismissed. (*See infra* § II(B)(1).)

In addition, this Court should reject the Complaint's allegations that Credit Acceptance acted deceptively or unfairly merely because the Attorney General apparently dislikes the lawful terms of the Contracts or otherwise believes that certain consumers who voluntarily entered into these Contracts should not have done so because, with the benefit of hindsight, he believes they could not afford them. In accordance with the voluminous state and federal rules and regulations that govern auto finance, consumers are presented with all of the information that the Mississippi Legislature and Congress have deemed necessary for consumers to make a free and informed choice concerning the terms of the Contracts they enter, including, among other things, the total amount financed, the monthly payment amount, the total number of payments, and the interest rate on the Contract. Armed with this and additional information—which the Complaint does not allege that Dealers or Credit Acceptance failed to provide—there is no legal basis to allege that consumers were prevented from making informed decisions when deciding for themselves whether to accept the terms of the Contracts at issue. Mississippi law is clear that all borrowers are presumed to have read and understood the terms of the contracts they execute, *see United Credit Corp. v. Hubbard*, 905 So. 2d 1176, 1178 (Miss. 2004), and the Complaint elides any

allegation that Credit Acceptance inhibited consumers from making free and informed choices. (*See infra* § II(B)(2).)  The Complaint also fails to allege any material misstatements made by Credit Acceptance that were likely to deceive reasonable consumers.  (*See infra* § II(B)(3).)

Finally, the Attorney General's requested relief is not cognizable as a matter of law.  The Complaint vaguely seeks to enjoin Credit Acceptance from acting "unfairly" or "deceptively." The Court cannot enter such an ambiguous and overbroad injunction.  (*See infra* § III(A).)  And because the plain terms of the MCPA make injunctive relief a prerequisite for obtaining any other relief under the MCPA, all such other relief is unavailable as well.  (*See infra* § III(B).) Accordingly, the Complaint should be dismissed in its entirety with prejudice.

## FACTUAL ALLEGATIONS[1]

Credit Acceptance is an indirect auto finance company.  (Compl. ¶ 12.)  Its financing program allows Dealers to sell vehicles to consumers regardless of credit history.  (*See id.* ¶¶ 17-18.)  Unlike in direct financing, where the consumer obtains a loan directly from a lender and then uses the proceeds of that loan to purchase a vehicle, Credit Acceptance does not have direct contact with consumers regarding the terms of their vehicle purchase.  (*See id.* ¶ 19.)  Rather, Credit Acceptance accepts assignment from a Dealer of Contracts once they are entered into between the Dealer and its customers.  (*See id.* ¶¶ 6-7, 12, 19, 22, 24, 39-40.)

Dealers submit credit applications from potential automobile purchasers to Credit Acceptance through the Company's Credit Approval Processing System ("CAPS").  (*See id.* ¶ 22.)  CAPS then provides a range of "financing" options that provide flexibility for the Dealer and consumer to negotiate and structure terms of a Contract that are acceptable to each, including

---

[1] Although Credit Acceptance strongly disputes the accuracy of many of the allegations in the Complaint, all well-pleaded facts in the Complaint are presumed true solely for purposes of this motion to dismiss. *See Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

the price of the vehicle. (*Id.* ¶¶ 22, 24; *see also id.* ¶ 33 (customers do not respond well to high sale prices).) After the consumer and the Dealer execute the Contract, the Dealer assigns the Contract to Credit Acceptance, which administers and services the Contract and collects amounts due from the consumer. (*See id.* ¶ 12.)

Notwithstanding Credit Acceptance's role (or lack thereof) in connection with the negotiation of the terms of Contracts voluntarily entered into between Dealers and consumers, the Complaint alleges that Credit Acceptance "harms consumers by charging inflated sale prices for cars in poor condition, pushing expensive ancillary products of questionable value, and charging interest rates at or near the maximum allowed under Mississippi law." (*Id.* ¶ 80.) Other than with respect to charging interest rates that the Attorney General concedes are *legal* under Mississippi law,[2] the Complaint makes plain that the Attorney General's focus is primarily on the origination practices of Dealers. In particular, the Complaint alleges that:

- *Dealers* "purchase . . . cheap, high-mileage cars that often are in poor condition" (*id.* ¶ 25; *see id.* ¶¶ 3, 26-28);

- *Dealers* "steer . . . customer[s] toward purchasing a vehicle which may be financed on terms that will be most profitable to the [D]ealer[s]" (*id.* ¶¶ 20, 22);

- *Dealers* "tier sale prices so that consumers with the poorest credit profiles receive the cheapest, lowest quality cars and pay the highest sale price markups" (*id.* ¶ 3; *see id.* ¶¶ 20, 23, 34-35);

- *Dealers* "tack on expensive ancillary products . . . to further increase the loan amount" (*id.* ¶ 3; *see id.* ¶¶ 39-40, 44, 48); and

- *Dealers* "install kill switches with GPS in consumers' cars" (*id.* ¶ 4; *see id.* ¶¶ 66-67).

The Complaint does not—and cannot—allege that Dealers are acting as Credit Acceptance's agents when engaging in these practices.

---

[2] In an effort to get around this critical fact, the Complaint posits an alternative method for calculating finance charges than the manner expressly required by TILA. (*See, e.g.*, Compl. ¶ 54.) Such a methodology is preempted by TILA. (*See infra* note 5.)

As for Credit Acceptance's *actual* role in connection with the alleged Dealer conduct, the Complaint merely alleges that the Company purportedly "encourages" Dealers to "buy vehicles with high mileages at lower wholesale values" (*id.* ¶ 25), sets "default" gross sale price markups in CAPS that Dealers can manually override to offer the consumer a lower price (*id.* ¶ 31), "incentivizes" Dealers to offer "CAC-approved vehicle service contracts (VSCs) and guaranteed asset protection (GAP) waivers through its third party providers" (*id.* ¶¶ 39-40),[3] and pays Dealers higher advances for using "starter interrupt devices" (*id.* ¶¶ 65-66).

In essence, the Complaint faults Credit Acceptance for its willingness to finance transactions involving consumers "with impaired or limited credit histories." (*Id.* ¶ 18.) The Complaint presents an unprecedented theory of "unfairness" that, because such borrowers are at a higher risk for default and "are more likely to have their cars repossessed and file for bankruptcy" (*id.* ¶¶ 1, 18, 43), it is wrong to account for such borrower risk in the terms of the Contracts for which Credit Acceptance is willing to accept assignment. (*See id.* ¶ 92(f), (j), (k).) But the Complaint does not allege that Credit Acceptance ever deceived or inhibited consumers from making a free choice in deciding whether to accept Contracts on the terms offered to them or that anyone—including the Dealers—failed to provide consumers with all of the Contract terms required to be disclosed under Mississippi and federal law.

The Complaint also faults Credit Acceptance for seeking to collect amounts owed on Contracts, repossessing collateral pledged to defaulted Contracts, and lawfully petitioning the Mississippi courts to satisfy Contract deficiencies. (*See, e.g.*, *id.* ¶ 58.) But the Complaint does not—and cannot—allege that Credit Acceptance failed to comply with all applicable rules and

---

[3] VSCs are agreements to perform or pay for certain mechanical repairs or services. (*See* Compl. ¶ 41.) GAP waivers cover the difference between consumers' Contract balances and the amount covered by their primary auto insurance in the event of a total loss due to damage or theft. (*See id.* ¶ 49.)

regulations when undertaking its collections practices.

As alleged by the Attorney General, it is a violation of "public policy" (and thus the MCPA) for a business to profit in the subprime auto lending space without guaranteeing that each and every borrower will successfully repay his or her Contract because the "injury" to consumers of obtaining a Contract that may be at a higher risk of default is not "outweighed by any countervailing benefit to consumers or competition" (*id.* ¶¶ 93-94), including the availability of financing for subprime consumers who "desperate[ly] need . . . cars." (*Id.* ¶ 16.) The Attorney General's approach in this action cannot be squared with the comprehensive fabric of federal and state laws that govern every facet of the indirect auto finance industry. Conspicuously absent from the Complaint is any allegation that Credit Acceptance violated the MVSFL or TILA, to name just a couple of the applicable governing laws. Nonetheless, the Attorney General seeks a permanent injunction, civil penalties, restitution, disgorgement of profits, attorneys' fees and costs under the MCPA. (*See id.* ¶¶ 9, 96-99.)

## LEGAL STANDARD

To survive a motion to dismiss, "[t]he plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. *Twombly*, 550 U.S. at 555. And where, as here, the plaintiff seeks to plead violations of the MCPA by relying on allegations of deceptive behavior, the heightened pleading requirements of Rule 9(b) should apply. *See Young v. Bristol-Myers Squibb Co.*, No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320, at *15 (N.D. Miss. Feb. 22, 2017). "Rule 9(b) requires 'the who, what, when, where, and how' [of the allegedly deceptive conduct] to be laid out." *Id.* at *16 (citation omitted).

## ARGUMENT

### I. THE ATTORNEY GENERAL CANNOT USE LITIGATION TO LEGISLATE A COMPREHENSIVELY REGULATED INDUSTRY

Indirect auto finance is heavily regulated, with sweeping state and federal laws, rules and regulations governing every facet of the industry. The Complaint contains no allegation that the Contracts assigned to Credit Acceptance from Dealers failed in any way to comply with this detailed regulatory scheme. Instead, the Attorney General seeks to use his enforcement authority under the MCPA to craft a new regulatory regime that—contrary to the extant regime—includes, among other things, different disclosure requirements and interest rate caps. The Attorney General's apparent disagreement with the Mississippi Legislature and United States Congress on the appropriate balance between consumer protection and access to credit is a matter properly addressed in the legislature and not the courts. Accordingly, the Attorney General's attempt to use the MCPA to circumvent the legislative process should be rejected.

### A. Indirect Auto Finance in Mississippi Is Governed By a Comprehensive Regulatory Scheme

In Mississippi, "[i]ndirect financing is the process regulated by Mississippi's Motor Vehicle Sales Finance Law, Miss. Code Ann. §§ 63-19-1 to -57." *Stubbs v. Miss. Farm Bureau Cas. Ins. Co.*, 825 So. 2d 8, 10 n.1 (Miss. 2002). The MVSFL sets forth Credit Acceptance's obligations in relation to every aspect of the indirect finance transactions addressed in the Complaint, in which a "retail buyer" (Miss. Code Ann. § 63-19-3(c)) purchases a car from a "retail seller" (*id.* § 63-19-3(d)) and obtains financing via a "retail installment contract" (*id.* § 63-19-3(g)). *See Stubbs*, 825 So. 2d at 10 n.1. "The seller is the original creditor, but typically the contract is promptly assigned to a 'sales finance company' . . . which becomes the 'holder.'" *Id.* (quoting Miss. Code Ann. § 63-19-3(e), (k)). "The assignment is likewise governed by statutory rules." *Id.* (citing Miss. Code Ann. § 63-19-45).

The MVSFL specifically requires that Contracts disclose, among other things, the: (1) sale price; (2) amount and form of down payment; (3) unpaid balance; (4) amount of official fees; (5) principal balance; (6) amount of finance charge; and (7) number of installments, amount of each installment and due date. *See* Miss. Code Ann. § 63-19-31(2). The MVSFL also sets maximum interest rates depending on the age of the motor vehicle. *See id.* § 63-19-43. And it authorizes lenders to collect on defaulting Contracts and governs the fees lenders can charge defaulting borrowers. *See id.* § 63-19-35.

Credit Acceptance also is subject to a comprehensive federal regulatory scheme. Congress enacted TILA "to protect the consumer from inaccurate and unfair credit practices, and 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.'" *Fairley v. Turan-Foley Imps., Inc.*, 65 F.3d 475, 479 (5th Cir. 1995) (quoting 15 U.S.C. § 1601(a)). Regulation Z was enacted to implement TILA's mandate and "set[] out certain guidelines for creditors to follow when disclosing the amount financed, the finance charge, and the annual percentage rate to the consumer and demand[] that these disclosures be accurate." *Id.* (citing 12 C.F.R. §§ 226.18, 226.22). In addition, "to protect consumers against debt collection abuses," Congress enacted the Fair Debt Collection Practices Act ("FDCPA"), which itself specifically defines and prohibits "abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692(a), (e); *see id.* §§ 1692d, 1692e, 1692f. The FDCPA also contains numerous other protections for consumers. *See, e.g.*, *id.* § 1692c.

**B.     The Attorney General Impermissibly Asks This
        Court to Use the MCPA to Legislate By Judicial Fiat**

The Complaint makes no mention of any of the comprehensive laws and regulations that govern Credit Acceptance's business practices. Nor does it even attempt to allege that Credit

Acceptance fails in any way to comply with them. Instead, it criticizes as "harmful to consumers" certain features of the Contracts assigned to the Company, including lawful ancillary service agreements[4] and allegedly "high interest rates," which the Complaint concedes are "allowed under Mississippi law."[5] (*E.g.*, Compl. ¶ 80.) The Complaint also faults Credit Acceptance's collections practices as "aggressive." (*E.g.*, *id.* ¶ 58.) But at no point does the Complaint come close to alleging specific *unlawful* conduct on the part of the Company.

The Attorney General attempts to cure the conspicuous failure to allege any conduct that is inconsistent with the comprehensive regulatory regime to which Credit Acceptance is subject by suggesting that Credit Acceptance failed to disclose sufficient information about its lawful lending and collections practices. For example, the Complaint asserts that Credit Acceptance has

---

[4] Despite the Complaint's criticism of VSCs (*see* Compl. ¶¶ 39-47), the Attorney General cannot dispute that the Mississippi Legislature has made its own public policy decision to authorize and regulate VSCs in Mississippi. *See* Miss. Code Ann. §§ 83-65-101 *et seq.* (Regulation of Vehicle Service Contracts). He also cannot dispute that the MVSFL specifically permits a Contract to incorporate the "amount, if any, included for insurance and other benefits," Miss. Code Ann. § 63-19-31(2)(d), and the Complaint acknowledges that this amount is disclosed to consumers as required by law. (*See* Compl. ¶ 51 ("One Mississippi consumer's loan included $2,489 for ancillary products . . . .").) Moreover, in stark contrast to its other disclosure-based allegations averring that disclosures were not provided, the Complaint concedes that the other required VSC disclosures are given to consumers, but asserts that those disclosures are not made "clearly and conspicuously" enough. (*Compare* Compl. ¶ 41, *with id.* ¶ 86(p).) However, the Attorney General does not (and cannot) identify any legal basis to transform compliant disclosures into MCPA violations merely because the Attorney General apparently takes issue with the form of such disclosures. In any event, to the extent any VSC disclosures are deemed deficient, Credit Acceptance is not the appropriate defendant. The Complaint concedes that SouthwestRe and Wynn's Extended Care are the "VSC providers" (*id.* ¶ 45), and any attempt to hold the Company liable for their alleged misconduct should be rejected. (*See infra* § II(B)(1).)

[5] The Attorney General suggests that finance charges should be calculated to "include[] the sale price markup (*i.e.* the difference between the sale price paid by a cash or prime credit buyer (the fair market value) vs. the sale price paid by a subprime buyer) and the ancillary products." (Compl. ¶ 54.) The Complaint then alleges that, under the Attorney General's calculation, the finance charges on some of the Contracts assigned to Credit Acceptance exceed the maximum finance charge allowed under Mississippi law. (*See id.*) But federal law precludes such a calculation. Credit Acceptance, as it must, calculates finance charges in accordance with TILA. Despite the Complaint being tethered to the premise that the MCPA can calculate finance charges as the Attorney General suggests, that calculation is preempted. *See* 15 U.S.C. § 1601(a); 12 C.F.R. § 226.28(a); *see also* 12 C.F.R. Pt. 226, Supp. I, Subpt. D, ¶ 28(a), cmt. 11 (Mississippi law preempted by TILA to the extent the term "finance charge [is] used under State law to describe a different amount than the finance charge disclosed under Federal law").

failed to disclose to consumers that the price on the car they are considering purchasing may be above fair market value, and to provide disclosures regarding the potential risk of default. (*See, e.g.*, *id.* ¶ 86(b)-(g), (m).) But such disclosure obligations are found nowhere in the MVSFL, TILA, Regulation Z or elsewhere,[6] and Mississippi courts have rejected claims under the MCPA based on alleged failures to disclose information when such disclosure was not required by law. *See, e.g.*, *Byrd v. Paw Paw's Camper City, Inc.*, 967 So. 2d 1251, 1253 (Miss. Ct. App. 2007).

Indeed, one Mississippi court concluded that a plaintiff had "no reasonable possibility of recovery" on an MCPA claim premised on the "alleged failure to disclose certain allegedly material information about [the plaintiffs'] loans, including, for example, that credit insurance was not required as a condition of the loans, that the insurance was overpriced, that the agents received a commission for the sale of insurance, and that the interest rate was exorbitant," because "*the information alleged to have been withheld from plaintiffs was either disclosed in the loan documents themselves . . . , or was not required to be disclosed.*" *Rawls v. Friedman's Inc.*, No. Civ. A. 4:02CV510LN, 2003 WL 21728838, at *2-3 (S.D. Miss. June 27, 2003) (emphasis added). Particularly apt here, several courts in Mississippi have rejected calls to impose disclosure requirements in the auto lending context beyond those mandated by state and federal law. *See Anderson v. Gen. Motors Acceptance Corp.*, 476 F. Supp. 2d 624, 626 (N.D. Miss. 2007) (declining to take on Mississippi Legislature's role by "requiring additional disclosures regarding the details of financing transactions"), *aff'd*, 269 F. App'x 452 (5th Cir.

---

[6] The Complaint asserts in conclusory fashion that Credit Acceptance fails to disclose "material information in contracts for ancillary products . . . information that is required by Mississippi law," but fails to identify any such Mississippi law or even specify what should be disclosed that is not. (Compl. ¶ 86(o).) Such "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim under even Rule 8(a)'s notice pleading standards. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557). For the same reason, the Complaint's bald assertion that Credit Acceptance "engag[es] in a pattern of using repossession agents who engage in illegal practices" (Compl. ¶ 86(x)), is facially deficient as a matter of law.

2008); *Davis v. Gen. Motors Acceptance Corp.*, 406 F. Supp. 2d 698, 700-01 (N.D. Miss. 2005) (dismissing claims against indirect auto lender when Contracts satisfied disclosure obligations).

What is more, the MVSFL itself contains an explicit safe-harbor provision to protect indirect auto lenders from makeweight claims like those asserted in the Complaint here. Specifically, the MVSFL provides that a licensee under the statute "shall have *no liability* for any act or practice *done or omitted in conformity with* . . . any rule, regulation, interpretation or approval of any other state or federal agency . . . ." Miss. Code Ann. § 63-19-57 (emphasis added). Thus, if Credit Acceptance (an MVSFL licensee), acts in compliance with controlling rules and regulations of a federal agency, such as with the provisions governing disclosures and finance charge calculations in Regulation Z, the Company's acts or omissions *cannot as a matter of law* form the basis for liability in Mississippi under other laws, such as the MCPA.

The Complaint's failure to allege that Credit Acceptance has violated any aspect of the MVSFL, TILA or any other controlling rule or regulation is fatal to the Attorney General's attempt to have this Court "'don its legislative cap' and presume to make illegal by judicial fiat" what otherwise are lawful, regulated business practices.[7]  *Anderson*, 476 F. Supp. 2d at 626. Because the Attorney General may not obtain "a judicial remedy for a business practice which is best addressed, if at all, at the legislative and/or regulatory level," the Complaint should be dismissed as a matter of law.  *Id.*; *see Archer v. Nissan Motor Acceptance Corp.*, 633 F. Supp. 2d 259, 269 (S.D. Miss. 2007) (noting "repeated[] reject[ion]" of state law claims against auto lenders that failed to allege specific statutory violations), *aff'd*, 550 F.3d 506 (5th Cir. 2006).

---

[7] While Credit Acceptance, as a first-party creditor, is not subject to the FDCPA, the Complaint does not come close to alleging that Credit Acceptance's debt collection activities run afoul of the standards Congress enacted to protect consumers from the debt collection practices it viewed as inherently "abusive, deceptive, and unfair." 15 U.S.C. § 1692(a); *see id.* §§ 1692b-1692j. The federal standards are notable because the Mississippi Legislature has not enacted analogous legislation in Mississippi.

## II.    THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE MCPA CLAIM

Even if the Attorney General were permitted to use litigation to attempt to police a novel regulatory regime that purportedly governs indirect auto finance companies' lending and collections practices (and he is not), the Complaint should be dismissed because it does not state a colorable MCPA claim.  As a threshold matter, the MCPA does not apply to either lending or debt collection.  And, even if it did, the Complaint fails to plausibly allege that the consensual, informed credit transactions at issue here are in any way "unfair" or "deceptive" to consumers.

### A.    The MCPA Does Not Apply to Lending or Debt Collection

Unlike the comprehensive regulatory scheme to which Credit Acceptance is subject (*see supra* § I(A)), the MCPA does not apply to Credit Acceptance's business of accepting assignment of Contracts voluntarily entered into between Dealers and consumers.  While the MCPA prohibits "unfair or deceptive trade practices in or affecting commerce," Miss. Code Ann. § 75-24-5(1), the terms "trade" and "commerce" are specifically defined to limit the MCPA's seemingly broad application to "the advertising, offering for sale, or distribution of any services and any property." *Id.* § 75-24-3(b).  Thus, while the Mississippi Legislature intended to protect the "consumer public" by its adoption of the MCPA, 1974 Miss. Laws Ch. 555 (H.B. 41), it did not intend for the MCPA to extend to every business activity in Mississippi.  To the contrary, courts in Mississippi have recognized that the Mississippi Legislature intended to limit the MCPA's reach to "trade" or "commerce" in "goods" or "services,"[8] and have dismissed MCPA

---

[8] A cursory review of the MCPA's specific prohibitions makes clear the Mississippi Legislature's general intent to limit the MCPA's reach to commerce or trade in goods or services. *See* Miss. Code Ann. § 75-24-5(2); *see also Kerr-McGee Chem. Corp. v. Buelow*, 670 So. 2d 12, 17 (Miss. 1995) ("[T]he proper way to determine the real intent of the legislature is to study the words used by it in context." (citation omitted)).  Tellingly, the Complaint does not tie any allegations to the trade practices specifically prohibited by the MCPA.  While the categories enumerated in section 75-24-5(2) should not be interpreted to limit the MCPA's general prohibition on unfair and deceptive practices, courts in Mississippi rely on these categories when assessing the viability of MCPA claims and have not hesitated

*(cont'd)*

claims deemed not to involve such trade or commerce. *See, e.g.*, *Burley v. Homeowners Warranty Corp.*, 773 F. Supp. 844, 863 (S.D. Miss. 1990) (construction defect insurance policy was not a "good" or "service" and thus the MCPA was "inapplicable"), *aff'd*, 936 F.2d 569 (5th Cir. 1991); *Taylor v. S. Farm Bureau Cas. Co.*, 954 So. 2d 1045, 1048-49 (Miss. Ct. App. 2007) (auto insurance policy not "merchandise" subject to the MCPA).[9]

Here, the Complaint cannot state an MCPA claim as a matter of law because the alleged improper conduct—the extension of credit and collection of debt—does not fall within the ambit of the MCPA. As an initial matter, Contracts are not "goods" or "services" subject to the MCPA. At least one court has dismissed an MCPA claim on the grounds that the plaintiff failed to allege "that a mortgage loan can constitute a 'good' or 'service' for purposes of the MCPA." *Humphrey*, 2013 WL 5407195, at *7; *see also generally Bryan v. Aron*, 941 So. 2d 831, 833 (Miss. Ct. App. 2006) (noting distinction between a check given as evidence of a "loan" and one "given in exchange for goods or services").[10] Other courts have reached similar conclusions to dismiss claims brought under analogous state consumer protection statutes. *See, e.g.*, *Campbell v. DLJ Mortg. Capital, Inc.*, 628 F. App'x 232, 237 (5th Cir. 2015) (making a loan is "neither a

_____

*(cont'd from previous page)*

to dismiss complaints that fail to establish at least some nexus to the practices deemed inherently "unfair" and "deceptive" by the Mississippi Legislature. *See, e.g.*, *Ross v. Quality Homes of McComb, Inc.*, No. 5:17-cv-46-DCB-MTP, 2017 WL 5505111, at *6 (S.D. Miss. Nov. 16, 2017) (dismissing complaint that "fail[ed] to tie any of [its] allegations to the MCPA's thirteen examples of 'unfair' and 'deceptive' practices"); *accord Berkley v. Midfirst Bank*, No. 3:15-CV-110-SA-SAA, 2016 WL 2907705, at *2 (N.D. Miss. May 18, 2016); *Humphrey v. Citibank NA*, No. 2:12CV148M-V, 2013 WL 5407195, at *7 (N.D. Miss. Sept. 25, 2013).

[9] The Attorney General's predecessor recognized the "goods and services" limitation on his authority to enforce the MCPA. *See* Op. No. 2000-0194, 2000 WL 638798, at *1 (Miss. Att'y Gen. Apr. 4, 2000).

[10] Lending does not fall within the ordinary meaning of either "goods" or "services." *See Goods*, Black's Law Dictionary (10th ed. 2014) ("Tangible or movable personal property other than money; esp., articles of trade or items of merchandise."); *Service*, Black's Law Dictionary (10th ed. 2014) ("Labor performed in the interest or under the direction of others; specif., the performance of some useful act or series of acts for the benefit of another, usu. for a fee. In this sense, *service* denotes an intangible commodity in the form of human effort, such as labor, skill or advice.").

good nor a service" and therefore falls outside the scope of Texas's Deceptive Trade Practices Act (citation omitted)); *see also Anderson v. HSBC Bank Nev., N.A.*, No. CV 09-04271 DDP (Ex), 2009 WL 10671379, at *6 (C.D. Cal. Sept. 23, 2009) (collecting cases and noting that "the majority of courts" have concluded that the "extension of [consumer] credit" does not constitute a "sale or lease of goods or services" under various similar consumer protection statutes).

In addition, debt collection activities, including foreclosure, repossession and steps taken in pursuit of litigation, do not constitute "trade" or "commerce." When a lender or other debt collector attempts collection of an antecedent debt, it is not "advertising," "offering for sale," or "distributi[ng]" "any services [or] any property." Miss. Code Ann. § 75-24-3(b). Numerous courts interpreting statutes analogous to the MCPA have concluded that debt collection and related activities cannot support claims for allegedly unfair and deceptive practices in "trade or commerce." *See, e.g., Rojas v. Wells Fargo Bank, N.A.*, 571 F. App'x 274, 279 (5th Cir. 2014) (dismissing Texas Deceptive Trade Practices Act claim based on "loan servicing and foreclosure activities"); *Pursell v. First Am. Nat'l Bank*, 937 S.W.2d 838, 842 (Tenn. 1996) (repossession of collateral securing a loan does not fall within the analogous definition of "trade or commerce" contained in Tennessee's Consumer Protection Act); *City of Cars, Inc. v. Simms*, 526 So. 2d 119, 121 (Fla. Dist. Ct. App. 1988) ("repossession of [a] car and its subsequent disposition" is not covered by Florida's Deceptive and Unfair Trade Practices Act because debt collection activities do not "relate[] to sales of goods and consumer services"). Thus, the challenged conduct cannot constitute a violation of the MCPA, and the Complaint should be dismissed.

**B.      Consensual, Informed Credit Transactions Are Not "Unfair" or "Deceptive"**

Putting aside the numerous facial deficiencies addressed above, the Complaint also fails to plausibly allege any "unfair" or "deceptive" conduct. The Mississippi Legislature has expressed its intention that, in "construing what constitutes unfair or deceptive trade practices,"

courts are to be "guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act." Miss. Code Ann. § 75-24-3(c). Under these standards, a trade practice is "unfair" only if it: "(1) causes or is likely to cause a substantial injury; (2) the injury is not 'outweighed by any countervailing benefits to consumers or competition that practice produces;' and (3) the injury could not have been 'reasonably avoided.'" *In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 841-42 (Miss. 2015) (quoting 15 U.S.C. § 45(n)). And a practice is "deceptive" only if: "(1) it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (citation omitted); *accord In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164-65 (1984). The Complaint fails to plausibly allege facts satisfying these standards.

### 1. Credit Acceptance Cannot Be Held Liable for Dealer Conduct

The Complaint should be dismissed because it attempts to hold Credit Acceptance liable for purported unfair or deceptive trade practices of third parties not named in this case. The Attorney General concedes that Credit Acceptance is an "indirect" lender that accepts assignment of Contracts *after* they are entered into by Dealers and consumers. (*See* Compl. ¶¶ 12, 85, 91.) Nonetheless, the Complaint attempts to fault Credit Acceptance for alleged origination misconduct that only *Dealers* could engage in, including, among other things, allegedly "[s]teering Mississippi consumers only to the cars and financing packages that are most profitable to dealers and CAC," "[o]bscuring from Mississippi consumers their cars' actual values," and "sell[ing] expensive ancillary products" that "may provide little or no benefit to Mississippi consumers." (*E.g.*, *id.* ¶ 86(h), (n); *id.* ¶ 92(j).) Elsewhere, the Complaint concedes that Credit Acceptance's role in the alleged origination misconduct is limited to purportedly "encourag[ing]" Dealers to buy cars at lower wholesale values and offering monetary

"incentives," such as higher up-front advances or commissions, to Dealers able to sell ancillary products or starter interrupt devices.  (*Id.* ¶¶ 25, 39-40, 44, 48, 66.)

It is black-letter law that a person is not ordinarily liable for acts or omissions committed by another person unless that other person is acting as the first person's agent.  *See Barrett v. Jones, Funderburg, Sessums, Peterson & Lee, LLC*, 27 So. 3d 363, 375 (Miss. 2009); 1 Jeffrey Jackson et al., *Encyclopedia of Miss. Law* § 4:19 (2d ed., West Oct. 2018).  And even then, a principal generally is not liable for an agent's torts unless the principal engages in some conduct beyond forming the principal-agent relationship, such as by ratifying the agent's wrongful acts.  *See Thatcher v. Brennan*, 657 F. Supp. 6, 8 (S.D. Miss. 1986) (citing *Horton v. Jones*, 44 So. 2d 397 (Miss. 1950)), *aff'd*, 816 F.2d 675 (5th Cir. 1987).  The Mississippi Legislature adopted these principles for licensed auto lenders in Mississippi, like Credit Acceptance.  *See* Miss. Code Ann. § 63-19-19 ("Each licensee shall be responsible for the acts of any or all of his employees while acting as his agent, if such licensee after actual knowledge of said acts retains the benefits, proceeds, profits or advantages accruing from said acts or otherwise ratified said acts.").

The Complaint does not even attempt to allege an agency relationship between Credit Acceptance and the Dealers with which it does business.  This is not surprising, as "courts are nearly universal in finding that auto dealers are not agents of auto financing companies." *Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 92-93 (M.D. Tenn. 2004).[11]  Thus, even if the conduct alleged in the Complaint regarding Dealer interactions with consumers is presumed to be "unfair" and "deceptive," the Complaint lacks the necessary allegations to link

---

[11] *E.g.*, *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 787 (11th Cir. 2005) (applying Alabama law); *Young v. Harbor Mortor Works, Inc.*, No. 2:07-CV-31 JVB, 2009 WL 187793, at *8 (N.D. Ind. Jan. 27, 2009) (applying Indiana law); *Wesley v. Schaller Subaru, Inc.*, 893 A.2d 389, 407-08 (Conn. 2006); *Bescos v. Bank of Am.*, 129 Cal. Rptr. 2d 423, 435 (Cal. Ct. App. 2003); *Chrysler Credit Corp. v. Barnes*, 191 S.E.2d 121, 127-28 (Ga. Ct. Ap. 1972).

that conduct to Credit Acceptance, the only defendant named in this case.

### 2. The Attorney General Cannot Second-Guess Informed Consumer Choices

Furthermore, the Attorney General lacks any legal basis to attempt to hold Credit Acceptance responsible for perceived "unfairness" in consensual, informed credit transactions entered into between Dealers and consumers. Notwithstanding the Complaint's repeated refrain that consumers were harmed when they defaulted on Contracts that they purportedly could not afford (*see, e.g.*, Compl. ¶¶ 1, 7, 55-56, 80), "regret in securing a loan [one is] unable to repay does not translate into a legally cognizable claim." *Rooster's Grill, Inc. v. Peoples Bank*, 965 F. Supp. 2d 770, 775 (S.D. Miss. 2013). For good reason. Borrowers themselves can "reasonably avoid" any harm associated with allegedly unaffordable loans. They have the ability to freely negotiate the terms of the Contracts into which they wish to enter with a Dealer, to transact with another Dealer that may have access to different sources of financing, or to not transact at all. This precludes any claim of "unfairness" with respect to the terms of the Contracts for which Credit Acceptance has accepted assignment. *See Davis*, 691 F.3d at 1168.

As one Mississippi court aptly noted, "[w]hile it is true that the automobile dealer is in an advantageous position in any automobile negotiation, it is also clear that consumers can and do ascertain for themselves whether a particular quoted price or interest rate is as advantageous as a salesman represents, such as by contacting other dealers or by doing independent research." *Anderson*, 476 F. Supp. 2d at 627; *see also id.* at 626 (acknowledging the "game" played by dealers and purchasers where "dealers attempt[] to ensure that a given customer pays as much as possible for a particular vehicle, while the customer [seeks] to pay as little as possible for the desired vehicle"). The Attorney General recognizes as much, alleging that consumers do not "respond . . . well" to high sale prices. (Compl. ¶ 33.)

18

As discussed above, consumers are presented with all of the information that the Mississippi Legislature and United States Congress have deemed necessary to make a free and informed choice concerning the terms of the Contracts they enter with Dealers, including, among other things, the interest rate on the Contract, the number of monthly payments, the monthly payment amount, the amount financed, and the total amount to be repaid over the life of the Contract. (*See supra* § I(A).) The Complaint is devoid of any allegations to the contrary. And the Complaint concedes that consumers receive the terms and conditions of VSCs and GAP coverage (Compl. ¶¶ 40-49), consent to the installation of starter interrupt devices (*id.* ¶ 67), and are informed "the company may repossess cars if consumers are in default" (*id.* ¶ 72). With this information available to them, consumers are capable of making informed decisions in light of their own personal circumstances, including whether the reward of having a car is worth the risk of defaulting on the Contract used to finance their purchase. *See, e.g.*, *Rabago v. Deutsche Bank Nat'l Tr. Co.*, No. 5:10-CV-01917-JST (DTBx), 2011 WL 2173811, at *4-5 (C.D. Cal. June 1, 2011) (dismissing unfairness claim when plaintiff could have reasonably avoided default on mortgage by "investigat[ing] the interest rate, loan payment terms, and costs and fees of the loan"); *see also Alpert Nationstar Mortg. LLC*, Case No. C15-1164 RAJ, 2019 WL 1200541, at *6-7 (W.D. Wash. Mar. 14, 2019) (no claim defendant compelled plaintiff to buy "excessive" insurance because "[p]laintiff was free, at any time, to choose his own insurance policy").

Claims alleging "unfair" trade practices must fail where, as here, consumers are able to make "free and informed choice[s]." *Davis*, 691 F.3d at 1168 (citation omitted) (affirming dismissal when consumer reasonably could have avoided annual fee by reading contract's terms and conditions); *accord Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 976 (D.C. Cir. 1985) (courts should not "second-guess the wisdom of particular consumer decisions"). The

Complaint's suggestion that subprime consumers are somehow less capable of understanding the terms of the agreements they enter and more susceptible to being "take[n] advantage of" (*e.g.*, Compl. ¶¶ 7, 16), provides no legal basis for finding that Credit Acceptance's lawful conduct violated the MCPA.  Indeed, Mississippi law is clear that *all* borrowers are presumed to have read and understood the terms of the contracts they execute.  *See, e.g.*, *United Credit Corp. v. Hubbard*, 905 So. 2d 1176, 1178 (Miss. 2004) (arbitration agreement enforceable notwithstanding plaintiff's contention that "she was ignorant as to what arbitration was and the UCCM employee did not explain it to her before she signed" because "[i]n Mississippi, a person is charged with knowing the contents of any documents that [she] executes" (citation omitted)).

Because the Complaint fails to allege that Credit Acceptance in any way inhibited consumers from making free and informed choices, the Complaint must be dismissed.

### 3. Credit Acceptance Has Not Made Any False or Misleading Representations to Consumers

Having failed to (i) allege a violation of any of the numerous laws that govern Credit Acceptance's business practices, (ii) identify any disclosure required by law that Credit Acceptance has not made, or (iii) identify any conduct on the part of Credit Acceptance that could be deemed "unfair" as a matter of law, the Attorney General is left having to plausibly allege that Credit Acceptance nevertheless engaged in "deceptive" conduct.  The Complaint fails to do so, much less with the requisite particularity.  *See Young*, 2017 WL 706320, at *15.

The Complaint alleges that Credit Acceptance has made misrepresentations that are likely to deceive Mississippi consumers.  (*See* Compl. ¶ 86(a), (i), (q); *id.* ¶ 87.)  For example, the Complaint challenges Credit Acceptance's generic slogan, "We change lives!," as deceptive because Credit Acceptance does not also advertise that some consumers default on their Contracts.  (*See id.* ¶¶ 1, 16, 86(a).)  But this slogan epitomizes the class of unquantifiable and

unverifiable statements of belief or opinion routinely deemed immaterial (and inactionable) as a matter of law. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496-99 (5th Cir. 2000) (trade slogans "not subject to quantifiable measures" are "non-actionable puffery"); *see also Davis*, 691 F.3d at 1168 (misstatement must be "likely to mislead [reasonable] consumers").

The Complaint also alleges that Credit Acceptance misrepresents itself to be a "traditional lender" through statements that accurately describe the indirect lending process: "'the dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to structure a contract that meets your needs,' and the consumer 'select[s] a vehicle that works for [the consumers'] needs and budget." (Compl. ¶¶ 24, 86(i).) The Complaint itself confirms the accuracy of this statement. (*See id.* ¶ 19 ("CAC is an indirect auto lender, meaning CAC only lends money to consumers who obtain financing through dealers as part of the car buying process rather than lending to consumers who obtain financing directly.").) That *Dealers* may "direct customers only to those vehicles and financing packages that work for the dealerships" does not render Credit Acceptance's statement deceptive. (*See supra* § II(B)(1).)

Finally, the Complaint alleges that Credit Acceptance "[m]isrepresent[s] to Mississippi consumers that [it] will only repossess cars from consumers' homes or where consumers' cars are stored." (Compl. ¶ 86(s).) This assertion is belied by the plain text of the Contracts from which the Attorney General selectively quotes, which states in full:

> **Repossession of the Vehicle.** If You default, We may take (repossess) the Vehicle from You. To repossess the Vehicle, We can enter Your property, or the property where the Vehicle is stored, so long as it is done peacefully and the law allows it. Any accessories, equipment or replacements will remain with the Vehicle. You hereby acknowledge and agree that any personal property contained within the Vehicle may be removed and held without liability to Us or our agent. It is Your responsibility to promptly and immediately contact Us to make arrangements for the return of Your personal property. You are responsible for paying all reasonable charges associated with the repossession.

(**Exhibit 1** at 4.)[12]  This disclosure clearly and unequivocally informs consumers that Credit Acceptance can repossess a vehicle in the event of default.  It then adds that the Company's right of repossession <u>also</u> gives it the right to "enter [a consumer's property], or the property where the Vehicle is stored" if permitted by law and if "done peacefully."  (*Id.*)  Nothing in this provision even remotely suggests limitations on the times or places that repossession can occur.[13]

## III.    THE ATTORNEY GENERAL IS NOT ENTITLED TO THE RELIEF SOUGHT

Even assuming the Complaint plausibly alleges a violation of the MCPA (and it does not), the Attorney General cannot obtain the relief sought in the Complaint.  At base, the permanent injunction sought—one to enjoin Credit Acceptance from violating the law—is impermissibly overbroad and vague.  And because an injunction is a prerequisite for obtaining any other relief under the MCPA, the remainder of the Complaint must be dismissed.

### A.    The Attorney General Seeks an Impermissible
Injunction Ordering Credit Acceptance to "Obey the Law"

The Complaint alleges violations of section 75-24-5(a) of the MCPA.  An action under that provision may only be brought under section 75-24-9, which provides only for injunctive relief.  *See* Miss. Code Ann. § 75-24-9.  Pursuant to this authority, the Attorney General broadly asks this Court to issue a permanent injunction that "enjoin[s] CAC from engaging in lending and collections practices that violate the" MCPA.  (Compl. ¶ 96.)

As a matter of law, the Attorney General cannot obtain such an injunction.  To "prevent uncertainty and confusion on the part of those faced with injunctive orders" and to "avoid the possible founding of a contempt citation on a decree too vague to be understood," a permanent

---

[12] In ruling on a motion to dismiss, the Court may consider documents incorporated in the complaint by reference or relied on by plaintiffs in the complaint and attached by defendants to the motion to dismiss. *See In re MCI Worldcom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778, 781 n.1 (S.D. Miss. 2002).

[13] To the extent such limitations exist, the Complaint lacks any allegation that Credit Acceptance failed to comply with the laws and regulations that apply to repossession.

injunction must "state its terms specifically" and "describe in reasonable detail" the conduct restrained or required. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2005) (citing *Schmidt v. Lessard*, 414 U.S. 473, 476 (1973); Fed. R. Civ. P. 65(d)). A general injunction to "obey the law" is *per se* impermissible and cannot be sustained. *See Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 898 (5th Cir. 1978) (nonspecific, "obey the law" injunctions "cannot be sustained"); *Hancock Cty. Bd. of Supervisors v. Ruhr*, No. 1:10CV564 LG-RHW, 2013 WL 4483376, at *3 & n.2 (S.D. Miss. Aug. 20, 2013) (dismissing complaint; noting that "the request for an injunction requiring counties to comply with the law . . . is a claim that is not capable of effective relief"); *accord N.L.R.B. v. Express Publ'g Co.*, 312 U.S. 426, 436-37 (1941).

The Attorney General's request to enjoin Credit Acceptance from violating the MCPA fails these fundamental specificity requirements. Indeed, the Attorney General asks the Court to enjoin the Company from engaging in conduct "not limited to" the allegedly "unfair and deceptive trade practices recited" in the Complaint. (Compl. ¶ 96.) Any such injunction would be subject to vacatur as overbroad and contrary to "the elementary due process requirement of notice." *Scott*, 826 F.3d at 212 (citation omitted); *accord Diageo N. Am., Inc. v. Mexcor, Inc.* 661 F. App'x 806, 814 (5th Cir. 2016); *Doe v. Venemen*, 380 F.3d 807, 818 (5th Cir. 2004).

Moreover, the requested injunction would require complex regulatory oversight that is not administrable by the Court. "[D]ifficulty of enforcement is, in itself, often a sufficient reason for denying injunctive relief." *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 n.3 (5th Cir. 1979) (citation omitted) (vacating preliminary injunction). The Attorney General effectively asks this Court to craft an entirely new regulatory regime for indirect lending in the subprime auto finance space (*see supra* § I(B)), and then to police compliance with that regime in perpetuity. For example, the Attorney General apparently expects the Court to entertain

contempt proceedings every time he believes a Mississippi consumer purchases a car in poor working condition, or every time Credit Acceptance accepts assignment of a Contract that the Attorney General believes a consumer ultimately may not be able to afford. (*See, e.g.*, Compl. ¶ 86(h), (j), (k).) Courts have rejected calls to impose similarly complex "regulatory injunctions" that commandeer the issuing court to serve as "an ad hoc regulatory agency to supervise the activities of the parties." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992); *see also Rodriguez v. VIA Metro. Transit Sys.*, 802 F.2d 126, 132 (5th Cir. 1986) (courts will not order injunctions that "require long-continued court supervision"); *accord Rutland Marble Co. v. Ripley*, 77 U.S. 339, 358-59 (1870).

Because similar oversight would be required to police the impermissible injunction the Attorney General seeks here, his prayer for injunctive relief should be dismissed. *See, e.g.*, *Ruffino v. City of Hoover*, No. CV 08-B-0002-S, 2009 WL 10687946, at *8 (N.D. Ala. Mar. 4, 2009) (dismissing prayer for injunctive relief at pleadings stage that sought an impermissible "obey the law" injunction); *Mancha v. Immigration & Customs Enforcement*, No. 1:06-CV-2650-TWT, 2007 WL 4287766, at *3 (N.D. Ga. Dec. 5, 2007) (same).

**B.      The Attorney General Is Not Entitled to Restitution, Civil Penalties, Investigative Costs or Reasonable Attorneys' Fees**

In addition to injunctive relief, the Attorney General also seeks disgorgement, civil penalties, attorneys' fees and costs. (*See* Compl. ¶¶ 97-99.) While the MCPA authorizes such relief, it does so only when that relief is "additional" to injunctive relief. Miss. Code Ann. § 75-24-11 (courts may make "additional" orders for restitution as necessary); *id.* § 75-24-19(1)(b) (civil penalties, investigative costs and reasonable attorneys' fees contingent on the Attorney General prevailing under section 75-24-9); *accord California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 1766775, at *11 (N.D. Cal. Apr. 15, 2008) (Attorney General is "limited to

injunctive relief" and "additional orders or judgments" in "seeking to redress violations under the MCPA"). Thus, injunctive relief is an essential prerequisite to a claim under the MCPA. Because the Complaint does not include a proper request for injunctive relief, the Attorney General cannot obtain any other relief, and the Complaint must be dismissed.[14]

## CONCLUSION

The Attorney General "lack[s] any Mississippi authority whatsoever which might support a conclusion that the sales and financing practices as alleged in the complaint are unlawful." *Anderson v. Gen. Motors Acceptance Corp.*, 476 F. Supp. 2d 624, 627 (N.D. Miss. 2007), *aff'd*, 269 F. App'x 452 (5th Cir. 2008). The Court should be "unwilling to create such authority on its own," *id.*, and accordingly should dismiss the Complaint in its entirety and with prejudice.

DATED:  May 24, 2019

Respectfully submitted,

**CREDIT ACCEPTANCE CORPORATION**

By:  */s/ R. David Kaufman*
  R. David Kaufman
  One of Its Attorneys

---

[14] Moreover, the Complaint fails to plausibly allege entitlement to civil penalties, attorneys' fees or costs. A court is authorized to award civil penalties, investigative costs and a reasonable attorneys' fee only if a plaintiff establishes that alleged MCPA violations were made "knowingly and willfully." Miss. Code Ann. § 75-24-19(1)(b). The Attorney General's 34-page, 100-paragraph Complaint contains merely three conclusory assertions—two of which are made in his "claims for relief"—that Credit Acceptance "knowingly and willfully" violated the MCPA. (*See* Compl. ¶¶ 9, 86, 92.) But "a formulaic recitation of the elements of a cause of action" will not suffice to establish entitlement to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

OF COUNSEL:

**BRUNINI, GRANTHAM,**
  **GROWER & HEWES, PLLC**

R. David Kaufman (MS Bar No. 3526)
M. Patrick McDowell (MS Bar No. 9746)
Cody C. Bailey (MS Bar No. 103718)
The Pinnacle Building, Suite 100
190 East Capitol Street (39201)
Post Office Drawer 119
Jackson, MS  39205
Telephone:  (601) 948-3101
Facsimile:  (601) 960-6902
(dkaufman@brunini.com)
(pmcdowell@bruninni.com)
(cbailey@brunini.com)

**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**

Jonathan Frank (*pro hac vice*)
Patrick G. Rideout (*pro hac vice*)
Four Times Square
New York, NY  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
(jonathan.frank@skadden.com)
(patrick.rideout@skadden.com)

Anand S. Raman (*pro hac vice*)
Darren M. Welch (*pro hac vice*)
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
(anand.raman@skadden.com)
(darren.welch@skadden.com)

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2019, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

/s/ R. David Kaufman
R. David Kaufman, MS Bar No. 3526