**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**STATE OF MISSISSIPPI** *ex rel.*
**JIM HOOD, ATTORNEY GENERAL OF
THE STATE OF MISSISSIPPI,**

        **Plaintiff,**

                                  **CASE NO. 3:19-cv-353-HTW-LRA**

**v.**

**CREDIT ACCEPTANCE CORPORATION**

        **Defendant.**

**PLAINTIFF STATE OF MISSISSIPPI'S MEMORANDUM OF LAW IN OPPOSITION
<u>TO CREDIT ACCEPTANCE CORPORATION'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

STATEMENT OF FACTS ........................................................................................ 1

THE STATE'S MOTION TO REMAND ................................................................. 6

LEGAL STANDARD .............................................................................................. 7

ARGUMENT ........................................................................................................... 8

I.      CREDIT ACCEPTANCE, LIKE OTHER COMPANIES THAT DO BUSINESS IN
        MISSISSIPPI, MUST COMPLY WITH THE MISSISSIPPI CONSUMER
        PROTECTION ACT .................................................................................... 8

        A.      The MCPA Is a Broad, Remedial Statute That Regulates Credit Acceptance's
                Conduct in Mississippi ...................................................................... 9

        B.      Conduct That Violates Other Laws Can Serve As Guidance of Violations of the
                MCPA, and Credit Acceptance's Conduct Violates Other Laws ........................ 10

        C.      The MCPA Can Also Require Additional Consumer Protections on Top of Laws
                ........................................................................................................ 13

II.     THE COMPLAINT ALLEGES A VIABLE CLAIM AGAINST CREDIT
        ACCEPTANCE .......................................................................................... 15

        A.      The MCPA Applies to Lending and Debt Collection ........................................... 15

        B.      Credit Acceptance *Itself* Engaged in Misconduct ................................................. 19

        C.      Credit Acceptance Only Takes Issue With Three of the Multitude of Deceptive
                Practices Alleged and Is Wrong .......................................................... 20

        D.      Credit Acceptance Prevented Informed Consumer Choices By Misrepresentations,
                Failures to Disclose, Concealment, and Predatory Practices ................................ 23

III.    THE INJUNCTION SOUGHT IS AUTHORIZED AND NOT A "PREREQUISITE" TO
        CIVIL PENALTIES UNDER THE MCPA .................................................................. 24

CONCLUSION ........................................................................................................ 25

Plaintiff, the State of Mississippi, by its Attorney General, Jim Hood ("State"), hereby submits its opposition to Defendant Credit Acceptance Corporation's ("Credit Acceptance" or "CAC") Motion to Dismiss, ECF 10.  The State's Complaint sufficiently alleges claims for unfair and deceptive trade practices against Credit Acceptance under Sections 75-24-5(1) and 75-24-5(2) of the Mississippi Consumer Protection Act ("MCPA"), Miss. Code Ann. §§ 75-24-1, *et seq*.  Accordingly, Credit Acceptance's Motion must be denied.

## STATEMENT OF FACTS

Credit Acceptance, a self-proclaimed "leader in the subprime auto finance industry," represents that it offers a second chance to credit-challenged car buyers.  *See* Compl. ¶¶ 1, 5, 16-20, ECF No. 1-1 ("Complaint").  Yet, its slogan, "We change lives!" and its representations that Credit Acceptance can improve consumers' credit distort the fact that Credit Acceptance's risky, unaffordable subprime auto loans change many lives for the worse by pushing consumers into financial ruin.  *Id*.  For Mississippi loans originated between 2012 and 2015, Credit Acceptance has a repossession rate of [data redacted[1]] and [data redacted] its loans are either delinquent or in default.  *Id*.  Despite high default rates nationwide, Credit Acceptance continues to increase its profits by millions of dollars a year because at every turn Credit Acceptance sets its system up to reap excessive profits from subprime consumers.  *Id*.

Credit Acceptance's patented business model maximizes Credit Acceptance's profitability and sets subprime consumers up to fail.  *Id*.  The patent for Credit Acceptance's credit processing system makes clear that it steers consumers to cars and loans that make the most money for Credit Acceptance.  *See* Compl. ¶ 21.  Under Credit Acceptance's model,

---

[1] The data is redacted because Credit Acceptance claims its data is "proprietary" and "trade secret" which prohibits the State from sharing that information publicly.  The State can provide an unredacted copy for in camera review to the Court.

dealers buy their inventory low and price it very high to offset the risk of lending to subprime consumers. *See* Compl. ¶¶ 1-5, 16-20, 21-38. Credit Acceptance's model tiers sale prices so that consumers with the poorest credit profiles receive the cheapest, lowest quality cars and pay the highest sale price markups. *Id*. On top of that, Credit Acceptance incentivizes dealers to tack on expensive ancillary products – described as "crap" by a Credit Acceptance former employee – to further prey on Mississippi subprime consumers and increases the unaffordability of the loan. *See* Compl. ¶¶ 39-52. Then, it charges high interest rates, frequently at or near the maximum finance charge allowed under Mississippi law; the interest rates – not the gross markups on the sale price of cars and ancillary products – are supposed to offset the credit risk presented by poorer credit borrowers. *See* Compl. ¶¶ 53-56. Credit Acceptance reaps excessive profits from Mississippi subprime consumers by squeezing as much money as it can out of them through collections, repossession, and litigation, utilizing harassing and humiliating tactics. *See* Compl. ¶¶ 57-79.

The State has alleged that Credit Acceptance violated Section 75-24-5(1) and Section 75-24-5(2) of the MCPA by engaging in deceptive trade practices, including, but not limited to:

a. Misrepresenting that Credit Acceptance changes consumers' lives, when in fact, many Mississippi consumers' lives are negatively impacted as a result of their Credit Acceptance loans;

b. Failing to disclose to Mississippi consumers that [data redacted] Mississippi consumers who do business with Credit Acceptance end up delinquent or in default on their Credit Acceptance loans;

c. Failing to disclose to Mississippi consumers that almost [data redacted] of Mississippi consumers who do business with Credit Acceptance have their cars repossessed;

d. Failing to disclose to Mississippi consumers their cars' actual value, even when required by Credit Acceptance's own contracts;

e.      Failing to disclose to Mississippi consumers that the cars are often in poor condition;

f.      Failing to disclose to Mississippi consumers significant sale price markups on their cars;

g.      Failing to disclose to Mississippi consumers with the poorest credit that they are steered to the cheapest, lowest quality cars with the highest relative sale price markups;

h.      Steering Mississippi consumers only to the cars and financing packages that are most profitable to dealers and Credit Acceptance;

i.      Misrepresenting to Mississippi consumers that "the dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to structure a contract that meets your needs" and the consumer "select[s] a vehicle that works for [the consumers'] needs and budget" when CAPS is set up so that the dealer presents to the consumer only those cars and financing packages that work for the dealers' and Credit Acceptance's needs and profits;

j.      Extending loans to Mississippi consumers with significantly inflated sale prices intended to offset the risk of lending to subprime consumers while also charging Mississippi consumers interest rates frequently at or near the maximum allowed under Mississippi law;

k.      Financing loans regardless of Mississippi consumer's ability to repay, based on Credit Acceptance's ability to repossess the collateral underlying the loan and its ability to profit from high sale prices and high interest rates despite defaults;

l.      Failing to disclose to Mississippi consumers that it makes loans regardless of the consumers' ability to repay, based on its ability to repossess the collateral underlying the loan and its ability to profit from high sale prices and high interest rates despite default;

m.      Failing to disclose to Mississippi consumers the known and significant risk that they will default based on the layers of risk Credit Acceptance has introduced into its underwriting;

n.      Encouraging dealers to sell expensive ancillary products that it knows, or reasonably should know, may provide little or no benefit to Mississippi consumers;

o.      Failing to disclose to Mississippi consumers material information in contracts for ancillary products, including, but not limited to, information that is required by Mississippi law;

3

p.   Failing to clearly and conspicuously disclose to Mississippi consumers that: (1) [Vehicle Service Contracts ("VSCs")] are not warranties and do not offer bumper-to bumper coverage comparable to new car warranties; (2) VSCs cover specifically defined parts and repairs; (3) VSCs have many restrictions and limitations, including that VSCs do not cover pre-existing issues, routine maintenance, or problems caused by normal wear and tear; and (4) VSCs require consumers to perform, and keep records to document, all maintenance and services recommended by the manufacturer;

q.   Misrepresenting to Mississippi consumers that kill switches are not a condition of financing, when in fact, many consumers cannot obtain financing unless they agree to have a kill switch installed in their car;

r.   Failing to disclose to Mississippi consumers that kill switches can be activated at any time or place; and

s.   Misrepresenting to Mississippi consumers that Credit Acceptance will only repossess cars from consumers' homes or where consumers' cars are stored.

Compl. ¶¶ 82-87.

In addition, the State has alleged that Credit Acceptance violated Section 75-24-5(1) and Section 75-24-5(2) of the MCPA by engaging in unfair trade practices, including, but not limited to:

a.   Misrepresenting that Credit Acceptance changes consumers' lives, when in fact, many Mississippi consumers' lives are negatively impacted as a result of their Credit Acceptance loans;

b.   Failing to disclose to Mississippi consumers that [data redacted], Mississippi consumers who do business with Credit Acceptance end up delinquent or in default on their Credit Acceptance loans;

c.   Failing to disclose to Mississippi consumers that almost [data redacted] of Mississippi consumers who do business with Credit Acceptance have their cars repossessed;

d.   Failing to disclose to Mississippi consumers' their cars' actual value, even when required by Credit Acceptance's own contracts;

e.   Failing to disclose to Mississippi consumers significant sale price markups on their cars;

f.      Extending loans to Mississippi consumers with significantly inflated sale prices intended to offset the risk of lending to subprime consumers while also charging Mississippi consumers interest rates frequently at or near the maximum allowed under Mississippi law;

g.      Failing to disclose to Mississippi consumers that the cars are often in poor condition;

h.      Steering Mississippi consumers with the poorest credit to the cheapest, lowest quality cars with the highest relative sale price markups;

i.      Failing to disclose to Mississippi consumers with the poorest credit that they are steered to the cheapest, lowest quality cars with the highest relative sale price markups;

j.      Obscuring from Mississippi consumers their cars' actual values;

k.      Misrepresenting to Mississippi consumers that "the dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to structure a contract that meets your needs" and the consumer "select[s] a vehicle that works for [the consumers'] needs and budget" when CAPS is set up so that the dealer presents to the consumer only those cars and financing packages that work for the dealers' and Credit Acceptance's needs and profits;

l.      Extending loans to Mississippi consumers on terms they believe they can afford but which Credit Acceptance knows, or reasonably should know, a significant percentage will not be able to repay, as a result of low credit scores, low income, high loan-to-value ratios, and other underwriting risks;

m.      Obscuring from Mississippi consumers the risks and lack of affordability of their loans by layering multiple underwriting risks on top of one another in the same loan;

n.      Underwriting loans with regard to Credit Acceptance's ability to profit from the loans even in the event of default, rather than Mississippi consumers' ability to repay the loans in full;

o.      Failing to disclose to Mississippi consumers that it makes loans regardless of the consumers' ability to repay, based on its ability to repossess the collateral underlying the loan and its ability to profit from high sale prices and high interest rates despite default;

p.      Extending loans on terms that enable and encourage dealers to sell and Mississippi consumers to buy, expensive ancillary products that may provide little or no benefit to consumers;

q.      Allowing dealers to omit material information in contracts for ancillary products sold to Mississippi consumers, including, but not limited to, information that is required by Mississippi law;

r.      Failing to clearly and conspicuously disclose to Mississippi consumers that: (1) VSCs are not warranties and do not offer bumper-to bumper coverage comparable to new car warranties; (2) VSCs cover specifically defined parts and repairs; (3) VSCs have many restrictions and limitations, including that VSCs do not cover pre-existing issues, routine maintenance, or problems caused by normal wear and tear; and (4) VSCs require consumers to perform, and keep records to document, all maintenance and services recommended by the manufacturer;

s.      Engaging in aggressive and harassing debt collection, including making multiple calls per day to Mississippi consumers who are behind on payments, and calling third parties when the consumers cannot be reached;

t.      Utilizing kill switches to harass Mississippi consumers;

u.      Misrepresenting that kill switches are not a condition a financing, when in fact, many Mississippi consumers cannot obtain financing unless they agree to have a kill switch installed in their car;

v.      Failing to disclose to Mississippi consumers that kill switches can be activated at any time or place;

w.      Repossessing cars and/or activating kill switches when Mississippi consumers are away from home, leaving them stranded; and

x.      Engaging in a pattern of using repossession agents who engage in illegal practices.

Compl. ¶¶ 88-94.

## THE STATE'S MOTION TO REMAND

On April 23, 2019, the State brought an enforcement action in the public interest pursuant to the Attorney General's statutory and *parens patriae* authority against Credit Acceptance in the Chancery Court of Hinds County, Mississippi.  *See* Compl. ¶¶ 1-15.  Credit Acceptance removed

the instant matter to this Court, asserting federal-question jurisdiction under 28 U.S.C. § 1331, on May 21, 2019.  *See* Notice of Removal at 1, ECF No. 1.

On June 20, 2019, the State filed its Motion to Remand and also seeks costs and fees because Credit Acceptance's removal is frivolous.  *See* Mot. Remand at 1, ECF No. 14.

The Court must first decide the State's Motion to Remand.  Credit Acceptance concedes this in its Opposition to the State's Motion to Remand.  *See* Mem. Opp'n Mot. Remand at 11 n.2, ECF No. 19.  Absent subject matter jurisdiction, the Court cannot decide the merits of the State's case.

## **LEGAL STANDARD**

Dismissal under Rule 12(b)(6) is not appropriate so long as the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  The Court "must treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

Contrary to Credit Acceptance's assertion, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) do not apply to claims under the MCPA.  *See* Mem. Supp. Mot. Dismiss at 7, ECF No., 11 ("Mot. Dismiss").  The Mississippi Supreme Court has repeatedly held: "[F]raud is not required to establish a violation of the Mississippi Consumer

Protection Act.  This makes a claim easier to prove, at least as relates to its deceptive nature, under the Mississippi Consumer Protection Act."  *Watson Lab., Inc. v. State*, 241 So.3d 573, 589 (Miss. 2018) (citation omitted); *see also In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So.3d 829, 841 (Miss. 2015) ("Mississippi does not require a finding of fraud for an act to be deemed unfair or deceptive, making our affirmance of the trial court's judgment on this issue even easier than affirming its finding of fraud above.").

## ARGUMENT

## I.   CREDIT ACCEPTANCE, LIKE OTHER COMPANIES THAT DO BUSINESS IN MISSISSIPPI, MUST COMPLY WITH THE MISSISSIPPI CONSUMER PROTECTION ACT

Credit Acceptance's main argument is that it is already regulated by other laws and thus cannot be subject to any additional requirements under the MCPA.  Rather than cite any support for this argument – an argument that would not only gut all state consumer protection laws, including the MCPA, but also allow every wrongdoer subject to more than one law to avoid prosecution by claiming it is subject to another law – Credit Acceptance argues the Attorney General is seeking to "legislate by lawsuit."[2]  Mot. Dismiss at 2.  It is worth noting that the Attorney General's *parens patriae* authority to sue, *see* Compl. ¶ 10, is established precisely when "the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982); *see also Miss. ex. rel. Hood v. Entergy Miss., Inc.*, No. 3:08-CV-780-

---

[2] Credit Acceptance falsely represents the Attorney General has singled out the company for an enforcement action.  Mot. Dismiss at 1.  The Attorney General's authority clearly extends to pursuing any defendant that has engaged in unfair and deceptive practices in violation of the MCPA.  Further, the Attorney General has a long history of going after predatory subprime lending practices, including in the subprime mortgage crisis, and currently has a pending case against Santander Consumer USA Inc., *Miss. ex. rel. Hood v. Santander Consumer USA Inc*., No. 25CH1:17-cv-00028 (Miss. Ch. Ct.), another subprime auto lender, in Mississippi state court for unfair and deceptive subprime auto lending and collections practices.

CWR-LRA, 2019 WL 1433772, at *1-2 (S.D. Miss. Mar. 30, 2019); *Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *3 (Miss. Ch. Ct. Jan. 17, 2006). But here, no one – not the Attorney General and not the Court – is being asked to legislate. The Attorney General brings this lawsuit within the four corners of long-existing consumer protection legislation – the Mississippi Consumer Protection Act – a broad, remedial statute, that prohibits companies, including Credit Acceptance, from engaging in unfair and deceptive trade practices affecting Mississippi consumers.

**A.    The MCPA Is a Broad, Remedial Statute That Regulates Credit Acceptance's Conduct in Mississippi**

The MCPA prohibits "unfair or deceptive practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1). The MCPA is a remedial statute intended to be liberally interpreted to carry out its purpose of "protect[ing] the citizens of Mississippi from deceptive and unfair trade practices." *Miss. Medicaid*, 190 So.3d at 841. When construing what constitutes unfair or deceptive trade practices under the MCPA, the legislature intended for courts to be guided by the interpretations given by the FTC and federal courts to Section 5(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. *See* Miss. Code Ann. § 75-24-3(c); *see also Miss. Medicaid*, 190 So.3d at 841. The United States Supreme Court has held that Section 5 of the FTC Act relating to unfair or deceptive trade practices is both broad in sweep and flexible in application. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240 (1972) ("It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field.").

The State has alleged, and will prove, that Credit Acceptance has engaged in deceptive acts – or acts that have a "capacity or tendency to deceive," *Watson*, 241 So.3d at 590 – under the MCPA by affirmatively misrepresenting and failing to disclose material information in its

auto lending practices in Mississippi.  *See* Compl. ¶¶ 82-87.  In addition, the State will demonstrate that Credit Acceptance's practices are unfair under the MCPA because they meet each of the required elements – (1) causes or is likely to cause a substantial injury; (2) injury is not outweighed by any countervailing benefits to consumers or competition that practice produces; and (3) injury could not have been reasonably avoided, *Miss. Medicaid*, 190 So.3d at 841 – to prove a practice is unfair and thus unlawful.  *See* Compl. ¶¶ 88-94.  None of these arguments require the Court to legislate; all fall squarely within the four corners of legislation the Mississippi legislature has already seen fit to enact and which applies to companies that do business affecting Mississippi consumers – including Credit Acceptance.

### B.      Conduct That Violates Other Laws Can Serve As Guidance of Violations of the MCPA, and Credit Acceptance's Conduct Violates Other Laws

As noted, the Court in interpreting the MCPA can look to, for guidance, violations of Section 5 of the FTC Act.  Further, in reviewing whether a trade practice is unfair, the Court "may consider established public policies as evidence to be considered with all other evidence." *Miss. Medicaid*, 190 So.3d at 841.  Failure to comply with the standards set forth in the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*, TILA's implementing regulation, Regulation Z, 12 C.F.R. part 1026, and the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.* ("FDCPA"), have been found to violate Section 5 of the FTC Act.  *See Seekonk Freezer Meats, Inc.*, 82 F.T.C. 1025, at *20 (1973) (failure to comply with TILA/Regulation Z constitutes a violation of the FTC Act); *see also* 60 Fed. Reg. 40263-01 (Aug. 8, 1995) (rescinding 16 C.F.R. pt. 237) (in "proceed[ing] against creditors for violations of § 5 in their debt collection activities, [the FTC] has used the [Fair Debt Collection Practices Act] as a model for appropriate standards of conduct").  Likewise, nothing in the MCPA prohibits the Court from looking to violations of the Mississippi Motor Vehicle Sales Finance Law ("MVSFL"), Miss. Code Ann. §§ 63-19-1 *et*

*seq.*, or other state or federal laws as guidance in assessing whether conduct is unfair or deceptive.

Credit Acceptance argues that the Complaint does not "allege any conduct that is inconsistent with [TILA or the MVSFL or other applicable laws] . . . ." Mot. Dismiss at 10. That is not true: While the Complaint does not allege a cause of action under TILA, the FDCPA, or the MVSFL, the Complaint alleges significant misconduct by Credit Acceptance, under the MCPA, that is also inconsistent with these other laws.

For example, the MVSFL requires that the retail installment contract state the "cash sale price" of the vehicle, Miss. Code Ann. § 63-19-31(2) – not the "sale price" as Credit Acceptance argues, Mot. Dismiss at 9. "Cash sale price" is explicitly defined in the statute as:

> [T]he price stated in a retail installment contract for which the seller would have sold to the buyer, and the buyer would have bought from the seller, the [vehicle] which is the subject matter of the retail installment contract, if such sale had been a sale for cash instead of a retail installment transaction."

Miss. Code Ann. § 63-19-3. The Complaint alleges that Credit Acceptance fails to disclose the cash sale price of its vehicles; indeed, the State's complaint alleges that Credit Acceptance fails to disclose to subprime Mississippi consumers the excessive sale price markups on their cars (over cash and higher credit quality buyers) and, specifically, fails to disclose to Mississippi consumers with the poorest credit that they face the steepest relative sale price markups. *See* Compl. ¶¶ 54 (defining sale price markup as difference between the sale price paid by a cash or prime credit buyer (the fair market value) vs. the sale price paid by a subprime buyer), 86(f) and (g), 92(h)-(j).

Likewise, many courts have found that the markups on the sale price of vehicles (and ancillary products) alleged in the Complaint can be a hidden finance charge prohibited under TILA. *See, e.g.*, *Gibson v. Bob Watson Chevrolet-Geo, Inc*., 112 F.3d 283, 286-287 (7th Cir.

11

1997) (undisclosed finance charge under TILA can exist when dealers charge markups for ancillary products that are "*systematically* higher on sales to credit customers than on sales to cash customers" (emphasis in original)); *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 932 (7th Cir. 1998) (higher price of vehicles charged to credit buyer is hidden finance charge under TILA); *Limtiaco v. Auction Cars.com, LLC*, No. 2:11-cv-00370-MMD-PAL, 2012 WL 4911726, at *3 (D. Nev. Oct. 15, 2012) ("A 'hidden' finance charge may exist where the price charged is above true market value.").[3]

The Complaint also alleges that Credit Acceptance adds overpriced, largely valueless ancillary products in a predatory fashion to offset the cost of lending to subprime consumers. *See* Compl. ¶ 40 (Credit Acceptance "creates an opportunity where consumers could be (and some have complained they are) charged for ancillary products *they did not want*") (emphasis added). Similar theories can be found under TILA. *See Berryhill v. Rich Plan of Pensacola*, 578 F.2d 1092, 1098 (5th Cir. 1978) ("language of both [TILA and the state law statute at issue] is broad enough to include a service agreement or membership fee imposed as a condition before credit is extended."). Likewise, and again contrary to Credit Acceptance's baseless arguments, *see* Mot. Dismiss at 11 n.6, the Complaint alleges that Credit Acceptance fails to disclose "the

---

[3] Credit Acceptance incorrectly asserts that Mississippi law conflicts with federal law when it comes to calculating finance charges. Mot. Dismiss at 10 n.5. Under both Regulation Z and the MVSFL, charges not charged in a comparable cash transaction are considered a finance charge. *Compare* 12 C.F.R. § 1026.4(a) ("The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.") *with* Miss. Code Ann. § 63-19-3(j) ("'Finance charge' means the amount agreed upon between the buyer and the seller, as limited in this chapter, to be added to the aggregate of the cash sale price, the amount, if any, included for insurance and other benefits and official fees, in determining the time price").

terms under which consumers will pay the contract" for its ancillary products as required under state law.  *See* Compl. ¶¶ 52, 86(o); Miss. Code Ann. § 83-65-111(2)(d).

### C.    The MCPA Can Also Require Additional Consumer Protections on Top of Other Laws

State consumer protection laws, like the MCPA, are flexible tools meant to protect consumers from practices that are impossible to exhaustively catalogue or narrowly define.  They create new protections for consumers and can "mak[e] conduct unlawful which was not unlawful under the common law or any prior statute."  *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008).  Specifically, Section 75-24-5(1) broadly covers any "unfair or deceptive trade practices in or affecting commerce" and applies "without limit[ation]" by the numerous enumerated prohibited acts in Section 75-24-5(2).

Credit Acceptance remarkably argues that if TILA or the MVSFL does not explicitly require a particular disclosure, the failure to disclose cannot violate the MCPA.  Mot. Dismiss at 9-12.  To the contrary, TILA explicitly recognizes that state law may require additional disclosures of information in connection with credit transactions so long as those requirements are not inconsistent with TILA.  *See* 15 U.S.C. § 1610 ("Except as provided in subsection (e) of this part, parts B and C of this subchapter do not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency").

Likewise, nothing in the MVSFL insulates lenders from conduct that falls outside the scope of the statute.  In addition, Credit Acceptance's argument about the so-called "safe-harbor" provision in the MVSFL is not only wrong but absurd.  Mot. Dismiss at 12 (arguing Credit Acceptance cannot be liable under Mississippi law, including the MCPA, if it acts in compliance

13

with controlling rules and regulations of a federal agency, such as Regulation Z).  Section 63-19-57 means that a licensee cannot be liable *under the MVSFL*, *see* Miss. Code Ann. § 63-19-55(1) (exempting from criminal sanctions licensees that are exempt from liability under Section 63-19-57), not *any* law that might otherwise apply to the licensee, such as the MCPA.  In any event, Credit Acceptance does *not* act in compliance with TILA/Regulation Z.  *See supra* at Section I.B.

Credit Acceptance's cases, *see* Mot. Dismiss at 11-12, are inapposite.  In *Byrd v. Paw Paw's Camper City, Inc*., 967 So.2d 1251, 1252 (Miss. Ct. App. 2007), an RV buyer alleged that the dealer violated the MCPA because the RV was neither "new" nor of the "standard" represented.  There, the Court found that the parts used to repair the RV were "new" and that the RV "met all applicable standards."  *Id*. at 1253-1254.  In *Rawls v. Friedman's Inc*., No. Civ.A. 4:02CV510LN, 2003 WL 21728838, at *3 (S.D. Miss. June 27, 2003), the Court found there was "no reasonable possibility of recovery" on a multitude of claims, including breach of fiduciary duty and the MCPA.  The Court held that the information was either (1) disclosed or (2) was not required to be disclosed because there was no evidence of a fiduciary relationship, without tying the latter to the MCPA claim.  *Id*. at *2-3.  In *Davis v. General Motors Acceptance Corp*., 406 F. Supp. 2d 698, 700 (N.D. Miss. 2005), there was no MCPA claim, and the court held that the plaintiff had not established a duty to disclose certain itemized information related to the finance charge when the law explicitly did not require the finance charge to be itemized.

In any event, the Mississippi Supreme Court has explained that a duty to disclose stems from tort law regarding fraud, *Holman v. Howard Wilson Chrysler Jeep, Inc.*, 972 So.2d 564, 568 (Miss. 2008) ("duty to disclose is based upon a theory of fraud"), and that the MCPA does not impose a fraud standard, *see Watson*, 241 So.3d. at 589 ("[F]raud is not required to establish

a violation of the Mississippi Consumer Protection Act.").  Affirmative misrepresentations as well as omissions can violate the MCPA so long as they have "the capacity or tendency to deceive," *Id.* at 590; there is no "duty to disclose" requirement.[4]

As noted, there is no request that the Court legislate here but rather apply the four corners of the law – the MCPA – to Credit Acceptance's unfair and deceptive conduct.  *See* Mot. Dismiss 11, 12 (citing *Anderson v. General Motors Acceptance Corp.*, 476 F. Supp. 2d 624 (N.D. Miss. 2007) and *Archer v. Nissan Motor Acceptance Corp.*, 633 F. Supp. 2d 269 (S.D. Miss. 2007)).

## II.       THE COMPLAINT ALLEGES A VIABLE CLAIM AGAINST CREDIT ACCEPTANCE

### A.       The MCPA Applies to Lending and Debt Collection

Credit Acceptance argues that lending is not covered under the MCPA because it is not a good or service.  Mot. Dismiss at 13-15.  Credit Acceptance's argument again requires it to misstate the law and mislead the Court.  First, nothing in the MCPA limits Attorney General actions to goods and services (unlike a private party action which is limited to goods and services, *see* Miss. Code Ann. § 75-24-15).  The Attorney General alone can enforce Section 75-24-5(1), *see* Miss. Code Ann. §§ 75-24-5(1) and 75-24-9, which applies to trade practices "in or affecting" commerce.  Subprime auto lending is clearly "in or affecting" "commerce."  "Trade" and "commerce" are defined as "the advertising, offering for sale, or distribution of any services and any property *tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated . . . .*"  Miss. Code Ann. § 75-24-3 (emphasis

---

[4] Even if the MCPA required a fraud-standard duty to disclose, Credit Acceptance here, holding itself out as changing lives and creating opportunities to improve credit, certainly had a duty to tell consumers that their data shows the contrary, and that their loans are excessive and unaffordable, as the Complaint alleges.

added, which was omitted by Credit Acceptance).  Lending is thus covered by the plain language of the MCPA.

Also, Section 5 of the FTC Act has been interpreted to apply to lending.  *See, e.g.*, *Am. Fin. Servs. Ass'n. v. F.T.C.*, 767 F.2d 957, 991 (D.C. Cir. 1985) (FTC within its authority to promulgate rules related to creditor practices or remedies, including both the "extension of credit" and "debt collection"); *Prepared Statement of the Federal Trade Commission Before the Subcommittee on Interstate Commerce, Trade, and Tourism Committee on Commerce, Science and Transportation,* 2007 FTC LEXIS 108, *29-30 (Sep. 12, 2007) (explaining that the FTC has brought, for example, twenty-one actions against companies and principals in the mortgage lending industry, focusing in particular on the subprime market).  Further, several courts have found lending to be covered by consumer protection statutes that apply broadly to "trade or commerce" like the MCPA.[5]

Many courts have also found, contrary to Credit Acceptance's contention, that lending does constitute a "good" or "service."[6]  Credit Acceptance's reliance on *Humphrey v. Citibank*

---

[5] *See, e.g.*, *McTeer v. Provident Life & Accident Ins.*, 712 F. Supp. 512, 514-15 (D.S.C. 1989) (loans are in "trade or commerce" under South Carolina consumer protection statute where "trade or commerce" is defined like the MCPA); *In re Milton.*, No. 04-13231, 2005 WL 6508305, at *5 (Bankr. E.D. Pa. July 26, 2005) (business of mortgage lenders and brokers are "a trade or commerce" within Pennsylvania consumer protection statute with the same definition as the MCPA); *In re Kittrell*, 115 B.R. 873, 877 (Bankr. M.D.N.C. 1990) ("Unquestionably, transactions between the debtor, as borrower, and [credit union], as lender, constitute acts or practices 'in or affecting commerce.'"); *Hawaii Cmty. Fed. Credit Union v. Keka*, 11 P.3d 1, 15 (Haw. 2000) ("a loan extended by a financial institution is activity involving 'conduct of any trade and commerce'"); *Baird v. Norwest Bank*, 843 P.2d 327, 334 (Mont. 1992) (Court held that "the Unfair Trade Practices and Consumer Protection Act applies to consumer loans by banks in the lending and collecting of such loans").

[6] *See, e.g., Villegas v. Transamerica Fin. Servs., Inc.*, 708 P.2d 781, 783 (Ariz. Ct. App. 1985) ("While a loan is ordinarily not thought of as a sale, in fact it is the sale of the present use of money on a promise to repay in the future.  In form it is no different than the sale of an object, such as a television set, on a future promise to repay."); *In re Wiggins*, 273 B.R. 839, 855

*NA*, No. 2:12CV148M-V, 2013 WL 5407195 (N.D. Miss. Sept. 25, 2013), is misplaced.  Mot.

Dismis at 14.  In that case, the federal Court merely held that the plaintiff "ma[de] no allegation"

that a mortgage loan can constitute a "good" or "service" for purposes of Section 74-24-5(1) of

the MCPA.[7]

The Texas case cited by Credit Acceptance, *Campbell v. DLJ Mortgage Capital, Inc.*,

628 F. App'x 232 (5th Cir. 2015) (cited at Mot. Dismiss at 14 ) does not support Credit

Acceptance's argument that the loans at issue here are not covered.  In *Campbell*, the Court held

that while the Texas consumer protection statute does not cover "a pure loan transaction," such

as a modification or refinancing, it does apply to loans "sought for the acquisition of a good or

service."  *Id*. at 237.  The Texas Supreme Court, in a case not cited by Credit Acceptance, ruled

that a credit extension in conjunction with the purchase of a vehicle is covered because the

---

(Bankr. D. Idaho 2001) (exchange of structured settlement annuity for cash is covered; "goods" include intangible property); *In re Smith*, 866 F.2d 576, 582 (3rd Cir. 1989) ("the business of mortgage lenders is the sale of a service within the scope of the UDAP"); *McTeer*, 712 F. Supp. at 515 (South Carolina consumer protection statute covers a mortgage loan since there is a sale of the present use of money for a promise to repay in the future); *Lemelledo v. Beneficial Mgmt. Corp.*, 696 A.2d 546, 551 (N.J. 1997) (loans meet the definition of "merchandise" which includes "anything offered, directly or indirectly to the public for sale"); *Garland v. Mobil Oil Corp.*, 340 F. Supp. 1095, 1099 (N.D. Ill. 1972) ("Only an artificially narrow construction would hold that the statute applies broadly to practices utilized to effect a sale, but cannot reach the practices utilized in its financing.").

[7] Credit Acceptance relies on Mississippi cases finding that insurance policies are not "goods" or "services" or "merchandise" subject to the MCPA.  *See* Mot. Dismiss at 14.  Section 75-24-5(2) explicitly contemplates that insurance policies are covered by the MCPA.  Miss. Code Ann. § 75-24-5(2)(m).  Credit Acceptance's reliance on a 2000 attorney general opinion related to contracts between chicken processing companies and their growers is also off-base.  Mot. Dismiss at 14, n.9.  The then-attorney general did not "recognize[] the 'goods and services' limitation on his authority to enforce the MCPA" but rather concluded that the MCPA is "generally" for the protection of consumers and does not regulate the relationship between businesses.  Op. Att'y Gen. 2000-0194, 2000 WL 638798, at *1 (Apr. 4, 2000).  Nonetheless, such advisory opinions are not binding on courts.  *Godbold v. Water Valley*, 962 So.2d 133, 135 (Miss. Ct. App. 2007).

transaction involves the purchase of a good (the car).  *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 388-389 (Tex. 1982).

Credit Acceptance also incorrectly asserts that debt collection is not covered under the MCPA.  Mot. Dismiss at 13-15.  The FTC Act, to which the MCPA looks for guidance, has long been applied to misrepresentations in debt collection, including by creditors.  *See, e.g.*, *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1173 (11th Cir. 1985) ("Unfair and deceptive debt practices have been the frequent subject of FTC enforcement action."); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979) ("The deceptive acts or practices forbidden by the Act include those used in the collection of debts.").  Further, contrary to Credit Acceptance's argument that it is not subject to the FDCPA because it is a "first-party creditor," Mot. Dismiss at 12 n.7, the FTC has said that the FDCPA provides guidance on what types of debt collection practices are prohibited against first-party creditors under the FTC Act.  *See* 60 Fed. Reg. 40263-01 (rescinding 16 C.F.R. pt. 237) (in "proceed[ing] against creditors for violations of § 5 in their debt collection activities, [the FTC] has used the FDCPA as a model for appropriate standards of conduct").  Courts in other jurisdictions have likewise found that debt collection constitutes "trade or commerce."[8]

---

[8] *See In re W. Acceptance Corp.*, *Inc.*, 788 P.2d 214, 216 (Idaho 1990) (collection of debts arising out of the sale of goods or services, including debt collection by third parties, fell within definition of "trade" and "commerce," when those terms were defined to mean "the advertising, offering for sale, sale, or distribution of any goods or services, directly or indirectly affecting people of this state."); *People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 64 (Ill. 1991) (third party debt collection services to collect fines arising from the violation of parking ordinances constitute trade or commerce covered by state consumer protection statute that relates to "trade" and "commerce" defined as "the advertising, offering for sale, sale, or distribution of any services . . . . and shall include any trade or commerce directly or indirectly affecting the people of this State."); *Schauer v. General Motors Acceptance Corp.*, 819 So.2d 809, 812 (Fla. Dist. Ct. App. 2002) (harassing debt collection efforts "fell within the [state consumer protection] statute's broad definition of 'trade or commerce'"); *In re Smith*, 866 F.2d at 581 (A different approach "would insulate all kinds of practices from the [state consumer protection

Courts have similarly determined that state consumer protection statutes analogous to the MCPA apply to repossessions.[9]

## B.     Credit Acceptance *Itself* Engaged in Misconduct

Credit Acceptance seeks to shift blame for its unlawful conduct to Mississippi dealers. Mot. Dismiss at 16-18.  But the Complaint alleges that *Credit Acceptance* engaged in unfair and deceptive conduct at every step:  Credit Acceptance advertises to subprime consumers in Mississippi "We change lives!" by offering consumers opportunities to improve their credit, but keeps data on Mississippi consumers to show that they will do worse, not better, by doing business with Credit Acceptance.  *See* Compl. ¶ 16.  Credit Acceptance created and patented a system that establishes the entire way in which loans with Credit Acceptance are done and is used to steer Mississippi subprime consumers to the most profitable – not affordable – loans. *See* Compl. ¶¶ 21-24.  Credit Acceptance's model requires dealers to sell overpriced, low quality cars with expensive, largely valueless ancillary products to offset the risk in lending to subprime consumers.  *See* Compl. ¶¶ 25-52.

On top of grossly overpriced cars and ancillary products, Credit Acceptance charges extremely high interest rates.  *See* Compl. ¶¶ 53-56.  Due to the hidden finance charges in inflated sale prices and overpriced add-ons, Credit Acceptance thus charges Mississippi

---

statute], such as debt collection, which occur after entering an agreement and which were not a basis for the original agreement"); *State ex. rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 525-56 (Iowa 2005) (consumer protection act covered creditor's dues collection efforts; "nothing in the Act places a bright-line temporal limit upon the Act's purview").

[9] *See, e.g., Jones v. Petty*, 577 So.2d 821, 823-824 (La. Ct. App. 1991) (applied the Unfair Trade Practices and Consumer Protection Law to wrongful repossessions); *Holley v. Gurnee Volkswagen & Oldsmobile, Inc.*, No. 00 C 5316, 2001 WL 243191, at *2 (N.D. Ill. Jan. 4, 2001) (repossession constitutes "trade or commerce directly or indirectly affecting the people of [the State of Illinois]").

subprime consumers much more than the stated interest rate to finance their cars – sometimes greatly exceeding the maximum finance charge under Mississippi law. *Id.*

When consumers do default, as expected, Credit Acceptance engages in aggressive and harassing collection, repossession, and litigation practices to pursue every last penny to maximize profits, pushing consumers further into financial crisis. *See* Compl. ¶¶ 57-79.

In short, rather than the passive indirect lender that merely "accepts assignment of Contracts *after* they are entered into by Dealers and consumers," as Credit Acceptance would have this Court think it is, *see* Mot. Dismiss at 16 (emphasis in original), the Complaint alleges in detail how Credit Acceptance creates, directs, and controls every step of the lending, collections, and repossession process. Notably, the Retail Installment Contract attached to Credit Acceptance's Motion to Dismiss is created, copyrighted, and mandated by Credit Acceptance. *See* Mot. Dismiss Ex. 1, ECF 10-1 (footer states "Mississippi Credit Acceptance Corporation © 2012-2017 Credit Acceptance Corporation. All Rights Reserved.") Moreover, even if, as a technical matter, Credit Acceptance is an "indirect" lender, despite its involvement and control at every stage of the process, the MCPA extends to unfair and deceptive conduct that "directly or indirectly" affects Mississippi consumers. Miss. Code Ann. § 75-24-3(b) (defining "trade or commerce").

### C.   Credit Acceptance Only Takes Issue With Three of the Multitude of Deceptive Practices Alleged and Is Wrong

The State alleges that Credit Acceptance engaged in several deceptive trade practices, including, but not limited to, the practices identified at Compl. ¶ 86(a)-(s) and which are described in additional detail in the factual allegations, *see* Compl. ¶¶ 16-79. Credit Acceptance takes issue with three of the alleged practices, and none of its complaints have merit.

First, Credit Acceptance claims its slogan "We change lives!" is "unquantifiable and unverifiable" and therefore "non-actionable puffery." Mot. Dismiss at 21 (citing *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 496-499 (5th Cir. 2000)). In *Pizza Hut*, the Court said "puffery" is "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *Id.* at 497. Puffing is a defense and the burden of proof is on Credit Acceptance to provide that the statement has no "capacity or tendency to deceive." *Watson*, 241 So.3d at 590. As in the *Pizza Hut* case, where a trial was held, development of a factual record may be necessary before a court can determine whether a statement is puffing. Here, Credit Acceptance cannot meet its burden of proving puffery. The Complaint alleges that Credit Acceptance misrepresented that it changes consumers' lives "when, in fact, many Mississippi consumers' lives are negatively impacted as a result of their CAC loans." Compl. ¶ 86(a). And, as the Complaint alleges, the number of consumers whose lives are changed *for the worse* is both quantifiable and verifiable and was turned over to the Attorney General in its investigation and used to support the alleged misrepresentation:

> CAC represents that it "change[s] lives" by offering consumers opportunities to improve their credit, but the data CAC keeps on Mississippi consumers – which CAC claims is proprietary and trade secret – shows that [data redacted], Mississippi consumers will do worse – not better – by doing business with CAC. For Mississippi loans originated between 2012 and 2015, CAC has a repossession rate of [data redacted] of its loans are either delinquent or in default. Rather than granting opportunities, CAC is actually just a lender of last resort that takes advantage of subprime consumers' desperate need for cars.

Compl. ¶ 16.

Credit Acceptance's second complaint is also meritless. Credit Acceptance asserts: "The Complaint also alleges that Credit Acceptance misrepresents itself to be a 'traditional lender' through statements that accurately describe the indirect lending process: '*the dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to*

21

*structure a contract that meets your needs*,' and the consumer '*select[s] a vehicle that works for [the consumers'] needs and budget*.'"  Mot. Dismiss at 21.  The italicized statements are statements made by Credit Acceptance to consumers on Credit Acceptance's website; the statements are deceptive because they do not accurately describe Credit Acceptance's process: The Complaint alleges that, unbeknownst to consumers, Credit Acceptance's model steers consumers into low quality cars with high sale price markups (as distinguished from "traditional" car purchases "where the consumer first selects a car and then discusses financing options for that specific car").  Compl. ¶¶ 23-24 ("CAC's system is designed to direct customers only to those vehicles and financing packages that work for the dealerships and thus CAC"—not consumers).

Third, Credit Acceptance's statements regarding repossessions are deceptive.  The full text quoted by Credit Acceptance first states "If You default, We may take (repossess) the Vehicle from you."  Mot. Dismiss at 21.  The next sentence reads:  "To repossess the Vehicle, We can enter Your property, or the property where the Vehicle is stored, so long as it is done peacefully and the law allows it."  *Id*.  The first sentence explains that in the event of default, Credit Acceptance *can* repossess the car.  The next sentence then explains that "*to*" do so, Credit Acceptance can enter the consumer's property or place where the car is stored – not any location where the car happens to be at any moment, "leaving consumers stranded," including in one case at "a dialysis center where [the consumer] was receiving treatment," and, in another at "her place of employment."  Compl. ¶ 72.

**D.    Credit Acceptance Prevented Informed Consumer Choices By Misrepresentations, Failures to Disclose, Concealment, and Predatory Practices**

Credit Acceptance wrongly asserts that its loans to subprime Mississippi consumers are the product of freely informed consumer choices.  Mot. Dismiss at 18-20.  The "unfairness" prohibition seeks to correct conduct "that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision making.'"  *Am. Fin.*, 767 F.2d at 976.  If the Court were to, as Credit Acceptance suggests, leave the subprime auto finance market to regulate itself, that would essentially "write[] the unfairness element out of [Section 5 of the FTC Act]," and, as a result, out of the MCPA.  *United Cos. Lending Corp. v. Sargent*, 20 F. Supp. 2d 192, 203 (D. Mass. 1998).

Credit Acceptance's claim that borrowers could have reasonably avoided the harm of taking on unaffordable loans is not true.  Mot. Dismiss at 18-20.  Credit Acceptance engaged in misrepresentations, failures to disclose, and concealment, *see* Compl. ¶ 92 (a) - (x), all of which obviously means that the subprime consumers' choices were not "informed."  The Complaint also alleges significant predatory lending conduct by Credit Acceptance.  Credit Acceptance proudly markets itself as a lender of last resort that will "approve every customer."  *See* Compl. ¶¶ 1, 16-20.  It targets vulnerable subprime consumers, who are in desperate need of a car and have little or no financing options.  *Id.*   Among other predatory practices, Credit Acceptance significantly inflates sale prices while also charging extremely high interest rates on loans to subprime borrowers, steers consumers with the poorest credit to the cheapest, worst cars with the highest relative markups, makes and underwrites loans that Credit Acceptance knows subprime consumers cannot afford, and makes loans regardless of the consumers' ability to repay based on

its ability to repossess the collateral and its ability to profit from high sale prices and high

interest rates despite default.  *See* Compl. ¶ 92 (f), (h), (l), (n), (o).

Many courts have held that these types of predatory lending practices are unfair under

state consumer protection statutes.[10]

## III.     THE INJUNCTION SOUGHT IS AUTHORIZED AND NOT A "PREREQUISITE" TO CIVIL PENALTIES UNDER THE MCPA

Again seriously mischaracterizing the Complaint, Credit Acceptance argues that the State

is seeking a "vague," "obey the law" injunction.  Mot. Dismiss at 22-24.  The Complaint alleges

twenty-five pages of detailed factual allegations, followed by two counts setting forth Credit

Acceptance's deceptive and unfair acts under Section 75-24-5 of the MCPA, also in explicit

---

[10] *See Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 56 (1st Cir. 2011) (making loan lender knows cannot be paid back may be an unfair or deceptive act or practice under state consumer protection statute); *Solomon v. Falcone*, 791 F. Supp. 2d 184, 190–191 (D.D.C. 2011) (denying motion to dismiss where plaintiff claimed loan made without regard to her ability to pay based on her actual income was unconscionable); *Haymer v. Countrywide Bank*, *FSB*, No. 10 C 5910, 2011 WL 2790172, at *4 (N.D. Ill. July 15, 2011) (denying motion to dismiss claim that lender and broker violated UDAP statute by giving consumer unaffordable mortgage loan – "[C]oncealing from a borrower the fact that she cannot afford repayments can constitute information upon which it can be expected that she would rely on in deciding to apply for a loan."); *Gilroy v. Kasper*, No. 07-cv-300-JL, 2008 WL 591049, at *4 (D.N.H. Mar. 3, 2008) (denying motion to dismiss where lender violated prohibition against unfair and deceptive practices by, *inter alia*, making mortgage loan while knowing consumer could not repay it).

The Office of the Comptroller of the Currency (OCC) has also issued guidance and regulations against these types of predatory lending practices in the mortgage industry, including making loans "based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan," *OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices*, AL 2003-2, at 1 (Feb. 21, 2003); *see also* 12 C.F.R. §§ 7.4008(b), 34.3(b). *See also Office of the Comptroller of the Currency, Comptroller's Handbook - Installment Lending* at 11 and 108 (Feb. 2016), available at https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/installment-lending/pub-ch-installment-lending.pdf ("underwriting criteria should always focus on an income stream rather than collateral liquidation for repayment."; "an assessment of the customer's financial capacity should be part of the underwriting process for all retail credit.").

detail, including 19 and 24 subparts, respectively.  *See* Compl. ¶¶ 86(a)-(s), 92(a)-(x).  The

Complaint then seeks to enjoin Credit Acceptance from engaging in lending and collection

practices that violate the MCPA, including "the unfair and deceptive trade practices *recited*

*herein*."  Compl. ¶ 96 (emphasis added).  Section 75-24-9 plainly authorizes the Attorney

General to seek this relief:  "Whenever the Attorney General has reason to believe that any

person is using, has used, or is about to use any method, act or practice prohibited by Section

75-24-5 . . . he may bring an action . . . to restrain by temporary or permanent injunction the use

of such method, act or practice."

Further, Credit Acceptance is wrong that civil penalties and fees[11] under Section

75-24-19 are "contingent on the Attorney General prevailing under Section 75-24-19."  Mot.

Dismiss at 24.   Section 75-24-19 allows recovery of civil penalties and fees and costs "in any

action *brought* under Section 75-24-9 [for an injunction]" – not any action in which an injunction

is ultimately awarded.  Miss. Code Ann. § 75-24-19 (emphasis added).  Indeed, the Mississippi

Supreme Court in *Watson* denied an injunction but nevertheless affirmed an award of millions of

dollars in civil penalties under the MCPA.  *See Watson*, 241 So.3d at 581.

## <u>CONCLUSION</u>

For the foregoing reasons, Credit Acceptance's Motion to Dismiss should be denied.

*/ / /*

---

[11] The State does not seek restitution as Credit Acceptance argues.  *See* Compl. Section VI Request for Relief.

Dated:  August 16, 2019

Respectfully submitted,


**PLAINTIFF, STATE OF MISSISSIPPI** *ex rel.*
**JIM HOOD, ATTORNEY GENERAL OF THE**
**STATE OF MISSISSIPPI**

By:     */s/ Mimi Liu*
        Mimi Liu (admitted *pro hac vice*)

        Jacqueline H. Ray MSB#100169
        Mary Jo Woods (MSB#10468)
        Donald L. Kilgore (MSB#3758)
        Special Assistant Attorneys General
        Office of the Mississippi Attorney General
        Post Office Box 220
        Jackson, Mississippi 39205
        Telephone: 601.359.3680
        Facsimile: 601.359.2003
        Email: jacra@ago.state.ms.us,
               mwood@ago.state.ms.us
               dkilg@ago.state.ms.us

OF COUNSEL:

        Mimi Liu (admitted *pro hac vice*)
        Elizabeth Paige Boggs (admitted *pro hac vice*)
        MOTLEY RICE LLC
        401 9th Street NW, Suite 1001
        Washington, D.C. 20004
        Telephone: (202) 386-9625
        Facsimile: (202) 386-9622
        Email: mliu@motleyrice.com
               pboggs@motleyrice.com

        Blake A. Tyler (MSB#101786)
        Jason M. Kirschberg (MSB#104860)
        GADOW TYLER PLLC
        511 East Pearl Street
        Jackson, Mississippi 39201
        Telephone: (601) 355-0654
        Facsimile: (601) 510-9667
        Email: blake@gadowtyler.com
               jason@gadowtyler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2019, I electronically filed the Plaintiff State of Mississippi's Memorandum of Law in Opposition to Credit Acceptance Corporation's Motion to Dismiss using the ECF.

Dated:  August 16, 2019

*/s/ Mimi Liu*_____

Mimi Liu (admitted *pro hac vice*)